OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005 FEB 22  P  5: 21

|  |  |
|---|---|
| NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC. et al.<br>Plaintiffs<br><br>v.<br><br>FEDERAL TRANSIT ADMINISTRATION et al.<br>Defendants | CIVIL ACTION<br>NO. 04cv11550-RCL<br><br><br>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

Section 106 of National Historic Preservation Act, 16 U.S.C. §470f, requires heads of federal agencies to take into account the effect of an undertaking on historic districts and buildings before approving the expenditure of federal funds on the undertaking. Section 4(f) of the Department Transportation Act of 1966, 49 U.S.C. §303, allows the approval of a transportation project on land on a historic site of national, state or local significance only if there is no feasible and prudent alternative to using that land and the project includes all possible planning to minimize harm to the historic site from the use.

Despite these clear statutory directives and extensive and detailed regulations clarifying the steps agencies must take, defendant Federal Transit Administration ("FTA") found "no adverse effect" in the placement of a glass and metal elevator structure and a stairway structure on a sidewalk in the Boston's

Back Bay Historic District, adjacent to a National Historic Landmark. The FTA
approved this site for this federally funded project, although the FTA's own
administrative record showed that defendant Massachusetts Bay Transportation
Authority ("MBTA") rejected feasible and prudent alternatives because private
landowner Ronald Druker (whose buildings were not historically significant)
objected to having an elevator structure on the sidewalk adjacent to his buildings.

**FACTS FROM FTA ADMINISTRATIVE RECORD**

In 1992, the MBTA sent the FTA a "Key Station Plan" for light rail and
heavy rail. AR1-AR101[1]. The MBTA submitted this Key Station Plan to comply
with the Americans with Disabilities Act ("ADA"). The MBTA designated
Arlington Street Station as one of the "key stations." AR29. Arlington Street
Station was to have elevators. AR49. In 1992, the MBTA was asking for an
extension of time to 1998, AR49-AR50, which the FTA granted. AR106-109.

The MBTA's architect, Leer Weinzapfel Associates, Architects, Inc.
provided an extensive analysis of possible sites for elevator entrances to Arlington
Street Station from the surface, dated November 21, 1997. AR124-AR161.[2] The
Leer Weinzapfel analysis is the only analysis of the suitability of various possible
elevator entrances to Arlington Street Station in the administrative record.

---

[1] The page references are to the FTA administrative record, which the FTA has already submitted to the District Court.
[2] The Leer Weinzapfel report is also attached to the Draft Environmental Assessment the MBTA submitted to the FTA, AR370-AR436, but apparently not to the Final Environmental Assessment, AR715-AR743.

A.    *Leer Weinzapfel Analysis*

On July 15, 1997, four possible locations at the four corners of the intersection of Arlington Street and Boylston Street for a surface elevator to Arlington Street Station were presented to a "Community Meeting," but all received opposition at this meeting, as follows:

- Option A, the southwest corner, adjacent to Shreve, Crump & Low, opposed by abutter, Ronald Druker

- Option B, the northwest corner, adjacent to Arlington Street Church, opposed by "Back Bay Architectural Association, Boston Landmarks Commission and Arlington Street Church

- Option C, the northeast corner, in a sidewalk "bulb-out" outside the Public Garden, opposed by the Boston Parks Department, the Boston Landmarks Commission and the Friends of the Public Garden and Common

- Option D, the southeast corner, adjacent to Hermes,[3] opposed by abutter Ronald Druker.

All four of these possible entrances "were directly connected to the "unpaid" area of the Arlington Street Mezzanine, *in order to create the best level of patron service.*" AR126 (emphasis added).

---

[3] This entrance appears to be within one of the two existing stairwells from the surface at that corner, in the stairwell further from the corner. AR127.

The Leer Weinzapfel report examines additional sites for the surface elevator and summarizes the analyses of these locations. The plaintiffs describe only the three following possible sites which relate to this civil action:

- Option A1, on the southwest corner, near Shreve Crump & Low, within the existing stairwell space closer to the corner. This was the least cost, but the Boston Redevelopment Authority "felt" this location unacceptably increased the visual and physical clutter of this corner.

- Option A2, on the southwest corner, near Shreve, Crump & Low, in the existing stairwell further from the corner. The cost was similar to Option A1. The location was acceptable to the Boston Redevelopment Authority and other city agencies, it met the ADA and MBTA technical criteria, but abutter Ronald Druker opposed it.

- Option B2, west-northwest from the corner, adjacent to the Arlington Street Church Parish House.[4] This location costs more than Option A2. This location meets the ADA criteria, but requires disabled patrons to use a "lengthy but well traveled corridor which may be an advantage for some patrons but a disadvantage for others.

---

[4] It is in this location, about 120 or 130 feet from the corner, where the MBTA proposes to place a surface elevator. Second Amended Complaint for Declaratory and Injunctive Relief ("Complaint") para. 10; Federal Transit Administration's Answer to Second Amended Complaint for Declaratory and Injunctive Relief ("FTA Answer") para. 10;

- Option D2, southeast corner in a sidewalk "bulb-out" on Boylston Street adjacent to Heritage-on-the-Garden. The estimated cost for this location is similar to Option A2, and this location meets ADA and technical criteria as well as or better than Option A2. This location was not preferred by the Boston Transportation Department. Opposition to this location was expected from abutter Ronald Druker.

AR126. See also drawing on AR127 showing possible locations for surface elevator.

The Leer Weinzapfel report also analyzes Options A1 and A2 (the two sites near Shreve Crump & Low) and Option D2 (the site which the MBTA proposed and the FTA approved.) The Leer Weinzapfel report provides no analysis of original Option D, described AR126 (and apparently shown as Option D1 at AR127), but some analysis of Option D2 provides insight into the original Option D also provides detailed analyses of the possible locations for the surface elevators. The following summarizes this analysis, as it applies to the FTA's justification for approving the selection of Option B2, adjacent to the Arlington Street Church Parish House.

---

Answer of Defendant Massachusetts Bay Transportation Authority Presenting Defenses

| | A1 SC&L closer to corner | A2 SC&L further from corner | B2 Church Parish House | D2 Bulb-out at Heritage-on-the-Garden |
|---|---|---|---|---|
| Surface location | Excellent | Excellent | Very good | Very good |
| Station accessible route | Excellent | Excellent | Good | Excellent |
| Abutter opposition? | Ronald Druker opposed | Ronald Druker opposed | Arlington Street Church may agree | Ronald Druker probably opposed |
| Geotechnical | Good | Good | Good | Very good |
| Construction phasing | Simple | Simple | Simplest | Simple |
| Est'd duration of surface construction | 12 months | 12 months | 12 months | 12 months |
| Utilities | List of 18 utility items including 2-12" water lines, 2 street light poles and 4 electric duct banks | Similar to A1 | Similar to A1 | Similar to A1 plus an additional electric duct bank, an additional street light pole and an additional 12" water |
| Stairwell capacity | Acceptable | Acceptable | Improved, allowing narrowing of corner staircase | No new stairwell included or required |
| Sidewalk width | Acceptable with no change | Acceptable with no change | Improved with narrowing of corner staircase | Improved, with widened sidewalk reducing length of Boylston St. crossing |

under Rule 12 ("MBTA Answer") para. 10.

| Pedestrian/vehicular conflicts | Acceptable: no change | Acceptable: no change | Improved at corner with narrowed stairwell; acceptable at sidewalk "bulb-out" at Parish House | Less accept, because cars in Boylston St. right-turn-only lane going straight |
| --- | --- | --- | --- | --- |
| Vehicular traffic | Acceptable: no change | Acceptable: no change | Acceptable with condition that new stairwell in "bulb-out" remain uncovered | Least acceptable, with bulb-out reducing traffic flow through intersection |
| Security | Good – good view of elevator from Arlington mezzanine (2d of 6 acceptable for security) | Acceptable – elevator cannot be seen from mezzanine, but in full view of patrons using SW corner stairwell, 36-44% of all patrons (3d of 6 acceptable for security) | Acceptable - elevator cannot be seen from mezzanine, but in full view of patrons using Parish House stairwell, estimated 15-20% of all patrons (5th of 6 acceptable for security) | Excellent – elevator is very visible from the Arlington mezzanine (1st of 6 acceptable for security) |
| Approximate cost | $14,400,000 | $14,700,000 | $16,500,000 plus land acquisition costs | $15,000,000 |

AR128-AR132

Perhaps most telling is the "Discussion" of each of these four potential locations for a surface elevator, quoted as follows.

A1 Shreve, Crump  Low corner, elevator closest to corner

>   Although this Option is the least expensive in construction cost, A2
>   is a better urban design for that corner at a similar cost and is more
>   acceptable to the BRA and Mr. Druker. Thus A1 is not
>   recommended.

A2 Shreve, Crump  Low corner, elevator further from corner

>   This Option would be the primary choice, except for the adamant
>   opposition of the immediate abutter, Ronald Druker. There is thus a
>   risk of lawsuit and delays if this option is chosen, perhaps offsetting
>   its many other advantages. (See below[5])

B2 Church Parish House

>   Although the estimated cost is higher than for A2 and it may be less
>   convenient for some MBTA patrons, this location has the major
>   advantage that it is provisionally acceptable to the abutter. Actual
>   costs may be decreased with further structural design.

D2 Heritage-on-the-Garden

>   Although this Option is similar in cost to the A1 and A2 Options and
>   would be relatively easy to construct, it is not a desirable option for
>   BTD and BPW and would probably be opposed by the immediate
>   abutter, Ronald Druker.

AR132

---

[5] The Leer Weinzapfel report continues with its consciousness of Ronald Druker's
preferences, "There may be a third option at this general site that may be more acceptable
to Mr. Druker. This Option A3 would renovate the two existing stairwells in front of
Shreve, Crump & Low and construct a new elevator in line with them further to the south,

B.     *MBTA Selection of Church Parish House Site*

On July 2, 1999, the MBTA informed the FTA that it had selected the Parish

House site for the surface elevator. AR169.

The March 10, 2000 FTA Quarterly Update notes that the selection of the

"location of the elevator at the surface was controversial because each of the four

potential corner locations, was problematic, either because of an adjacent National

Historic Register building, or a National park, or abutters' complaints." AR259.

C.     *Emergence of Unsubstantiated Justification for Parish House Site*
       *Selection*

On October 18, 2001, the MBTA faxed a "Project Description" to the FTA.

AR270.

The October 18, 2001 "Project Description" states,

> The southeast corner adjacent to Heritage on the Garden was not
> acceptable to the abutter and was not desirable due to low pedestrian
> traffic from that quadrant. The southwest corner adjacent to Shreve,
> Crump & Low was not acceptable to the abutter and was not
> desirable due to the narrow seven-foot wide sidewalk at that
> location.

AR270.

The October 18, 2001 "Project Description"clearly states that the Heritage

on the Garden location and the Shreve Crump & Low location were rejected

because they were 'not acceptable to the abutter," AR270, who was Ronald

---

beyond the building entrance. This would probably add -$500,000 to the cost of A2 for a
total of 415.2 million." AR132.

Druker, AR128, AR132. The other reasons the MBTA gave for rejecting these sites has no support in FTA Administrative Record.

The non-Druker justification for rejection of the southeast corner near Heritage on the Common in the MBTA's October 18, 2001 "Project Description" is lack of desirability "due to low pedestrian traffic from that quadrant." AR270. The only analysis in the administrative record, the Leer Weinzapfel report, states that a southeast corner site has "Very Good" surface location for accessibility, the same rating as the Church Parish House location chosen now chosen for the surface elevator. The Leer Weinzapfel report also notes that the southeast quadrant has 18% of all evening trip origins and patrons, AR128, almost the same as the 15-20% of all patrons who would use a Church Parish House entrance. AR132. In addition, if pedestrian traffic from a quadrant were such an important factor, the southwest corner, at Shreve, Crump & Low would still be the best choice, because that quadrant has 40% of all evening trip origins and of all patrons. AR128. Combined with the elevator at the intersection providing the same travel distance as the general population[6] has (in contrast with the Church Parish House location which adds a 150 foot travel distance for 60% of the patrons) it is clear why Leer

---

[6] The ADA Accessibility Guidelines for Buildings and Facilities, §4.3.2(1), states, "The accessible route shall, to the maximum extent feasible, coincide with the route for the general public." (Guidelines available at http://www.access-board.gov/adaag/html/adaag.htm .) The Church Parish House site is 120 or 130 feet from the Arlington Street-Boylston Street intersection, see n.4 above, where the Arlington Station mezzanine is located, and the Church Parish House site requires travel through a long tunnel between the elevator and the mezzanine.

Weinzapfel rates surface location accessibility "Excellent" for the Shreve, Crump Low site, but only "Very Good" for the Church Parish House site. See AR128.

The defendants' non-Druker justification for undesirability of the southwest corner, near Shreve, Crump & Low, is "the narrow seven foot sidewalk at that location." AR270. The Leer Weinzapfel report, however, is clear that the sidewalk width at Shreve, Crump & Low is "Acceptable." No sidewalk width change is planned; it remains unchanged with a seven foot width. AR131. Because the southwest corner sites at Shreve, Crump & Low use existing stairwells for surface elevator locations, the sidewalk widths will remain at the unchanged seven foot widths without regard to the location of the surface elevator.

The same language from the October 18, 2001 "Project Description," justifying rejection of surface elevator siting at the southeast and southwest corners, is repeated throughout the FTA's administrative record, in the MBTA's Draft Environmental Assessment submitted to the FTA, AR379, in the MBTA's Final Environmental Assessment submitted to the FTA, AR723, and in the FTA's Finding of No Significant Impact. AR745. Despite the repetition of supposed lack of pedestrian traffic and narrowness of the sidewalk, nothing in the administrative record suggests that such problems exist, matter, or are anything but excuses to cover the true reason for gravitating toward the Church Parish House site, namely the opposition of landowner Ronald Druker and fear of his potential lawsuit. AR132.

11

D.    *Adverse Effect on Historic District and Building*

The project is within the Back Bay Historic District, a district listed on the State and National Register of Historic Places. AR265; AR390; AR460; AR734; AR736; AR747. The FTA administrative record also identifies the Arlington Street Church as a National Historic Landmark. *E.g.*, AR270; AR369; AR374; AR375; AR379-AR383; AR745; AR747.

Both the MBTA's submissions in the FTA administrative record and the FTA's Finding of No Significant Impact itself contradict the FTA's finding that the proposed project has "no adverse effect" on the Back Bay Historic District and on the historic Arlington Street Church.

The MBTA's Environmental Assessment may say that the siting of the surface elevator does not impact views of the Arlington Street Church across Arlington Street, AR719, but it clearly omits direct reference to the interference of the view of the historic church across Boylston Street. The discussion of minimizing and mitigating the effect, however, clearly shows that an adverse effect exists.

An elevator structure obstructing the view of the Arlington Street Church is an adverse effect. The administrative record itself shows this, because northwest corner of the Arlington Street-Boylston Street intersection was rejected as a surface elevator location because it obstructed the view of the Arlington Street Church. AR723. It is also clear that the Church Parish House location chosen approved by

12

the FTA has an adverse effect in obstructing the view of the historic church,

because both the MBTA and the FTA place great significance on the efforts to

"minimize" the visual impact by making the height of the elevator structure only

13 feet tall, by using a painted metal frame structure with transparent glass in front

of the brownstone church building.  AR719-720; AR747; AR755.  "Minimizing"

an adverse impact is inconsistent with the claimed non-existence of an adverse

impact.

The MBTA's Draft and Final Environmental Assessments also tout

mitigating measures for the Arlington Street Church under the heading "Historic

Properties and Parklands."  AR375; AR379; AR719; AR720; AR747.  Mitigation

of adverse impact is inconsistent with the claimed non-existence of adverse

impact.

The administrative record also shows how important the Arlington Street

Church is both as a historic building itself, and as a part of the Back Bay Historic

District.  The architectural features of the church, including its small chapel in the

rear, entered from Boylston Street, and its Tiffany windows, show the architectural

significance.  AR755, AR757.  The church is also significant in the Unitarian

denomination, and it is considered the mother church of that denomination.

AR757.  In addition, the church is the first church and the first public building of

the Back Bay.  AR757.  The 1973 application for inclusion on the National

Register of Historic Places also notes, "The position of the church at a major urban

13

crossroads exemplifies the important role churches played in the development of

the Back Bay and in the maintenance of the community's character." AR757.

## ARGUMENT

I.    NATIONAL HISTORIC PRESERVATION ACT

The National Historic Preservation Act § 106 requires that before approving

the expenditure of federal funds in a federally assisted undertaking, the head of a

federal agency must take into account the effect of the undertaking on any district

or building that is included in or eligible for inclusion in the National Register of

Historic Places, and provide the Advisory Counsel on Historic Preservation a

reasonable opportunity to comment.  16 U.S.C. §470f.  Regulations promulgated

under this statute make clear how the federal agency is to determine how historic

properties are to be identified, how to assess adverse effects on historic properties,

how to resolve adverse effects employing alternatives, by minimizing those effects

or by mitigating them, and the what procedure to follow if no resolution is

obtained in attempts to resolve adverse effects.  33 C.F.R. Part 800.  Special

protection is accorded National Historic Landmarks.   33 C.F.R. §800.10

The FTA's administrative record shows that the Back Bay Historic District

is listed on the National Register of Historic Places.  *E.g.*, AR747.  The FTA's own

Finding of No Significant Impact describes the Arlington Street Church as a

National Historic Landmark. AR747.  The problem is that the FTA has determined

that the construction of a 13 foot tall elevator headhouse on the Boylston Street

sidewalk partially obstructing the view of the Arlington Street Church has no adverse effect on the historic nature of the historic church building or on the Back Bay Historic District.

An adverse effect is found when a project may alter, directly or indirectly, any of the characteristics of a historic property in a manner that would diminish the integrity of the property's setting, location, feeling or association. 33 C.F.R. §800.5(a)(1). A non-exclusive list of examples of adverse effects include "[i]ntroduction of visual ... elements that diminish the integrity of the property's significant historic features." 33 C.F.R. §800.5(a)(2)(v). The FTA's finding of "no adverse effect" stops the inquiry before getting to the issue of resolution of adverse effects, described in 33 C.F.R. §800.6. 33 U.S.C. §800.3(a)(1).

The FTA does not comply with the §106 of the National Historic Preservation Act by a ritualistic recitation of magic words that lead it through a merely procedural framework. In addition to the procedural obligations of this statute, the act also imposes "a substantive obligation in deciding whether to authorize the federal action. *Save our Heritage, Inc. v. Federal Aviation Adm'n*, 269 F.3d 49, 58 (1st Cir.2001). Without substituting its judgment for the FTA's, the District Court can see that the administrative record is blatantly inconsistent with a finding of finding of "no adverse effect."

First, the administrative record shows that placing the new structures on the northwest corner of Boylston Street and Arlington Street, visually obstructing the

view of the church, was rejected as a surface elevator location *because* it visually obstructed the view of the church. AR723.

Second, the administrative record shows efforts made to minimize and mitigate the effects of the surface elevator siting on Boylston street. AR375; AR379; AR719-720; AR747. The existence of adverse effects before efforts to minimize those effect or to mitigate for those effects is not only a necessary logical conclusion[7], it is part of the regulatory framework. After an adverse effect is determined, the agency must resolve those adverse effects by consulting "to develop and evaluate alternatives or modifications to the undertaking which could avoid, minimize or mitigate adverse effects on historic properties." 33 C.F.R. §800.6(a).

The FTA has simply said that "no adverse effect" exists, and then accepted a course of resolving adverse effects which does not comply with 33 C.F.R. §800.6. By taking this course, the FTA adopted a course which considered only minimization or mitigation of adverse effects on historic properties, but not alternatives or modifications which could avoid the adverse effects. Whether different locations for the surface elevator are considered an alternative or modification, the FTA departed from the regulatory scheme in avoiding a hard look at those other sites which would avoid adverse effects on historic properties. In

---

[7] Claiming "no adverse effect" while touting the minimization and mitigation of such effects is like someone claiming he does not have a car while bragging how he keeps his car clean and vacuumed.

16

fact, the FTA's Finding of No Significant Impact noted that the other locations had been rejected due to opposition from the abutter (Ronald Druker) and due to considerations of pedestrian traffic and sidewalk width which are not only absent from the record, but are contradicted by the record.

The result of this arbitrary and capricious finding of "no adverse effect" is the selection of a site in front of a building the FTA recognizes as a National Historic Landmark which is the oldest church and oldest public building within a historic district on the National Register of Historic Places, because of the opposition of a single landowner of property without any historic character demonstrated in the administrative record. An administrative decision on expenditure of federal funds affecting historic sites cannot be made, in whole or in part, by consideration of pressures outside the statutory and regulatory framework. Such decisions must be made "completely without regard to any considerations not made relevant by Congress in the applicable statutes." *D.C. Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C.Cir.1972)(in challenge to siting of bridge as interfering with historic site, "the decision would be invalid if based in whole or in part on the pressures emanating from" a congressman).

By the FTA's unsupported and self-contradicted assertion of "no adverse effect," it attempts to avoid reaching both the question of how it could approve a site which not only visually obstructed the historic Arlington Street Church within the Back Bay Historic District, and the question of how it did not consider other

17

sites without any hint of adverse effect on historic sites, which are less expensive,

better suited to the purpose of getting patrons who cannot use stairs into Arlington

Street Station without going through a hundred foot tunnel, and do not require land

acquisition. It is clear from the administrative record that the southwest corner of

Boylston Street and Arlington Street (near Shreve, Crump & Low) would have

been the preferred location of the surface elevator, if not for the opposition of a

single owner of property not shown to have historic character. AR132. Such

pressure, not a valid consideration under §106 of the National Historic

Preservation Act, cannot be a valid basis for visually obstructing the Arlington

Street Church. *D.C. Federation of Civic Ass'ns, supra* at 1245-1246. Accepting

the FTA's self-contradicted incantation of "no adverse effect" matters, gives effect

to this pressure, which Congress has not authorized to influence the process.

Because the FTA has not met its obligations under 16 U.S.C. §470f and its

regulations, the Court should declare that the FTA's Finding of No Significant

Impact is invalid, and enjoin the disbursement of funds to the MBTA's Arlington

Street Station's project.

II.     DEPARTMENT OF TRANSPORTATION ACT OF 1966, SECTION 4(f)

Under Section 4(f) of the Department of Transportation Act of 1966, the

Department of Transportation may approve a project "requiring the use ... of land

of a historic site of national, state or local significance ... only if

(1)     there is no prudent and feasible alternative to using that land; and

18

(2)    the program or project includes all possible planning to minimize

harm to the … historic site resulting from the use."

49 U.S.C. §303. Regulations have been promulgated under that statute. 23 CFR

§771.135.

Under the §4(f) regulations,

Supporting information must demonstrate that there are unique
problems or unusual factors involved in the use of alternatives that
avoid these properties or that the cost, social, economic, and
environmental impacts, or community disruption resulting from such
alternatives reach extraordinary magnitudes.

23 C.F.R. §771.135(a)(2)[8].

Because nothing in the administrative record suggests that federal, state and

local officials having jurisdiction over the Back Bay Historic District or the

historic Arlington Street Church consider that district or that building to be "not

significant," both the district and the building are presumed to be significant. 23

C.F.R. §771.135(c).

The question is whether the FTA has chosen the plan which minimizes

harm. *Geer v. Federal Highway Administration*, 975 F.Supp. 47, 75

(D.Mass.1997)(review of administrative decision under DOT Act of 1966, §4(f)).

The District Court "must carefully review the record to insure that there was a

consideration of the relevant factors and no clear error of judgment." *Geer, supra*

at 75.

The project at issue in this action is in the Back Bay Historic District, so it is within 49 U.S.C. §303. In addition, this statute applies because it is proposed to be built, in part, on land of the Arlington Street Church, which the administrative record describes as a National Historic Landmark. For the same reasons noted above with regard to the National Historic Preservation Act, the obstruction of a main street view of the first public building and first church in the Back Bay Historic District with a glass and metal structure containing elevator equipment has an adverse effect on the district, as well as on that historic building.

Under Section 4(f), the review required by statute and regulation is even more stringent than under the National Historic Preservation Act. To proceed with a project, "*no* prudent and feasible alternatives" must exist, and "*all* possible planning" must be done to minimize harm. 49 U.S.C. §303 (emphasis added.)

Again, the prudent and feasible alternatives of the corners on the south side of Boylston Street are not only apparent, but also the preferred options but for the the opposition of a single landowner, Ronald Druker, whose property is not shown to have any historic significance. AR128-AR132. Considerations of cost and functionality, including access for those unable to use stairs without traversing a hundred foot tunnel, favor elevators near Mr. Druker's property, but Mr. Druker objected. The objections of Mr. Druker to the conversion of a stairwell in the sidewalk in front of his building to an elevator is not within any possible

---

[8] The FTA follows 23 C.F.R. Part 771 for compliance with the National Environmental

considerations Congress made relevant under 49 U.S.C. §303. For this reason, the rejections of these sites, in whole or in part because Mr. Druker objected, must invalidate the FTA's Finding of No Significant Impact. *D.C. Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1245-1246 (D.C.Cir.1972).

Because the FTA's Finding of No Significant Impact is unsupported (and even contradicted) by the FTA's administrative record, the District Court should declare it invalid and enjoin federal funding of the MBTA's project, as proposed and approved.

III.    MASS. HISTORIC PRESERVATION ACT, Mass. G.L. c. 9, §27C

Massachusetts requires any state agency to determine whether a project has an adverse effect on properties listed in the state register of historic places, and to consult to eliminate, minimize or mitigate the adverse effects. G.L. c. 9, §26B, §27C. Any suggestion that the Massachusetts Historic Commission has made a final determination that the MBTA's proposed project has no adverse impact ignores the correspondence from the Massachusetts Deputy Historic Preservation Officer that her concurrence with the determination is provisional. AR460. Even if the state historic preservation officer has made a final determination, that determination suffers from the same infirmities noted above with respect to federal historic preservation statutes.

---

Policy Act of 1979 and related statutes. 49 C.F.R. §622.101.

In addition to the Massachusetts Historic Commission's avoidance of its statutory responsibilities under G.L. c. 9, §27C (as more fully described in 950 C.M.R. Part 71) which parallel the federal statutory and regulatory scheme under the National Historic Preservation Act, the MBTA has also avoided entering a Memorandum of Understanding with the Mass. Historic Commission describing the feasible alternative which eliminates, minimizes or mitigates the adverse effects of the project.  950 C.M.R. §71.07(3)(d).

Without a final decision of the Mass. Historic Commission (or with an invalid determination of "no adverse effect") the MBTA's project cannot proceed. Mass. G.L. c. 9, §27C.  The District Court should so declare, and should enjoin the MBTA from proceeding without a final and valid determination by the Mass. Historic Commission.

## CONCLUSION

The District Court should declare that the FTA's Finding of No Siginficant Impact is invalid, and should enjoin the federal funding of the MBTA's siting of an elevator and stairway on the Boylston Street sidewalk adjacent to the Arlington Street Church.

The District Court should also declare that the Massachusetts Historic Commission has not made a final decision with regard to the MBTA's project siting an elevator and stairway on the Boylston Street sidewalk adjacent to the

Arlington Street Church, and should enjoin the MBTA from proceeding with this

project.

Plaintiffs Neighborhood Association
of the Back Bay, Inc., Dorothy
Bowmer, Marianne Castellani, Ann
D. Gleason and Frederick C. Gleason,

By their attorney,

Gerald Fabiano, BBO No. 157130
Pierce, Davis & Perritano, LLP
10 Winthrop Square, 5th Floor
Boston, MA 02110
617-350-0950

Certificate of Service

I hereby certify that a true copy of the
above document was served upon all
counsel of record, by mail, on February
22, 2005.

Gerald Fabiano

23