IN THE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEIGHBORHOOD ASSOCIATION | ) | |
| OF THE BACK BAY, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. NO. 04-11550-RCL |
| v. | ) | |
| | ) | |
| FEDERAL TRANSIT | ) | |
| ADMINISTRATION and | ) | |
| MASSACHUSETTS BAY | ) | |
| TRANSPORTATION AUTHORITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT FTA'S CONSOLIDATED MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Alleging violations of National Historic Preservation Act and the Department of Transportation Act of 1966, plaintiffs have sued the Federal Transit Administration ("FTA") and Massachusetts Bay Transportation Authority ("MBTA") to block construction of a new handicap-accessible entrance to the MBTA Arlington Street Station because, according to plaintiffs, the proposed new entrance, including a stairway and elevator kiosk, will partially obstruct the view of Arlington Street Church. *Second Am. Compl.* at ¶ ¶ 10, 12. Plaintiffs misconstrue the record and applicable statutory and regulatory requirements, and so their challenge fails. Examination of the administrative record demonstrates that the FTA satisfied all procedural requirements of the relevant federal statutes, properly determined that the project will not adversely affect the church's historic qualities, and acted well within the bounds of reasoned decision making. Plaintiffs' Motion for Summary Judgment should be denied and judgment should enter for the FTA on Counts I and II.

**STATUTORY AND REGULATORY BACKGROUND**

The Arlington Street Church is listed on the National Register of Historic Places and the State Register of Historic Places, and is part of the Back Bay Historic District.  *Second Am. Compl.*, ¶¶ 13-16.[1]  The purpose of the MBTA project at issue is to make the Arlington Street Station compliant with the Americans With Disabilities Act of 1990 ("ADA").  AR102, 126, 677.  The proposed project will be financed with federal funds from the United States Department of Transportation ("DOT").  *Second Am. Compl.*, ¶ 11.  The  FTA is the agency within DOT that is authorized to provide federal grants to state and local agencies to assist certain local and regional mass transit projects, including planning, developing, construction and improvement of mass transportation facilities.  49 U.S.C. § 5301(f).  The FTA is exclusively a grant-awarding agency; it funds projects only upon application for specific projects by state and local agencies. Id., § 5304(a).  State and local transit entities are eligible for federal grants provided they comply with federal requirements, including those of the ADA.  See, e.g., AR111, 218, 233-34.

Plaintiffs allege that the FTA's approval and funding of the proposed new entrance to the Arlington Station violate Section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 ("Section 106"), and Section 4(f) of the Department of Transportation Act of 1966 ("DOTA"), 49 U.S.C. § 303 ("Section 4(f)").  All federally funded transportation programs must comply with a number of federal environmental protection and historic preservation laws,

---

[1] The Back Bay is not part of an "Architectural District," *Second Am. Compl.,* ¶17,  but rather a "Historic District."  AR265, 390.  As plaintiffs are no doubt aware, the Arlington Street Church is on the National Register, but is not a National Historic Landmark ("NHL"), see AR757, although the MBTA and FTA mistakenly refer to it as such in some documents.  E.g., AR380, 724.  NHLs are afforded additional protections under Section 106 beyond those afforded to other National Register properties.  36 CFR 800.10.

2

including Section 106 of the NHPA and Section 4(f). <u>Valley Cmty. Pres. Comm'n v. Mineta</u>, 373 F.3d 1078, 1084 (10th Cir. 2004). In this case, the FTA was responsible for ensuring that the proposed Arlington Street subway project was consistent with, *inter alia,* the substantive and procedural requirements of Section 106 and Section 4(f).

In addition, the ADA requires public transit agencies to identify so-called "key stations" and develop a plan to implement accessibility improvements at these stations. AR001, 004-7. Under ADA regulations, <u>see</u> 49 CFR 37.51, all key stations were required to be made accessible no later than July 26, 1993, unless an extension was granted. AR111. FTA regulations generally require recipients of federal grants for transportation to make each individual mode of transportation supported by federal funds -- bus, subway, streetcar, and commuter rail -- "accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 49 C.F.R. §37.47; AR118. All key stations on subway and commuter rail systems, together with at least one vehicle per train, must, unless the requirement is specifically waived, be accessible to wheelchair users. 49 C.F.R. §§ 27.81-27.119 (1979). The Arlington Street Station was identified as a key station under ADA criteria. AR27-29; 114.

**<u>The NHPA, 16 U.S.C. § 470, "Section 106</u>"**

In the Second Amended Complaint, plaintiffs allege a violation of 16 U.S.C. § 470f ("Section 106").[2] Section 106 requires federal agencies proposing federal assisted undertakings

---

[2] "Section 106 is the shorthand name, taken from the congressional bill number, for a federal review process under the NHPA. Section 106 requires any federal agency to take responsibility for the impact of their decisions on historic resources." <u>Comm. to Save Cleveland's Huletts v. U.S. Army Corps of Eng'rs</u>, 163 F. Supp. 2d 776, 781 n. 8 (N.D. Ohio 2001) (<u>citing</u> 16 U.S.C. § 470f). Section 106 provides in relevant part that:

[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State . . . shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license,

to "take into account" the effect of the undertaking on any building included in or eligible for the

National Register.  The regulations promulgated pursuant to Section 106 impose a consultation

process to carry out the law's mandate.  Section 106 imposes procedural obligations on federal

agencies to obtain information they must take into account.  <u>Valley Cmty. Pres. Comm'n</u>, 373

F.3d at 1085 (<u>citing</u> <u>City of Alexandria v. Slater</u>, 198 F.3d 862, 871 (D.C. Cir. 1999)).  As the

First Circuit has stated, "Section 106 is characterized aptly as a requirement that agency

decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes."

<u>Narragansett Indian Tribe v. Warwick Sewer Auth.</u> 334 F.3d 161, 166-67 (1st Cir. 2003), <u>citing</u>

<u>Muckleshoot Indian Tribe v. U.S. Forest Serv.</u>, 177 F.3d 800, 805 (9th Cir.1999).[3]  Under

Section 106, the agency is first required to consult with the State Historic Preservation Office

("SHPO") to: a) determine and document the area of potential effect; b) identify historic

properties within the scope of potential effects; and c) determine whether those properties are

listed in the National Register of Historic Places.  <u>Comm. to Save Cleveland's Huletts</u>, 163 F.2d

at 789 (N.D. Ohio 2001) (<u>citing</u> 36 C.F.R. § 800.4).  If the agency determines that a historic

---

. . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.  The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470(f) (2004).

[3] Plaintiffs provide an inaccurate quotation to argue that Section 106 "also imposes 'a substantive obligation in deciding whether to authorize the federal action.'"  *Plaintiffs' Memorandum* at p. 15.  The actual quotation from the cited case is "The act thus imposes both a substantive obligation <u>to weigh effects</u> in deciding whether to authorize the federal action and a procedural obligation to consult." <u>Save Our Heritage, Inc. v. Federal Aviation Adm'n</u>, 269 F.3d 49, 58 (1st Cir. 2001)

property may be affected, the agency shall notify all consulting parties.[4]  36 C.F.R. § 800.4(d)(2).

The agency then must evaluate whether the proposed project has any adverse effects and

consider any views provided by consulting parties and the public in accordance with § 800.5.

An adverse effect is when "an undertaking may alter, directly or indirectly, any of the

characteristics of a historic property that qualify the property for inclusion in the National

Register in a manner that would diminish the integrity of the property's location, design, setting,

materials, workmanship, feeling or association." 36 C.F.R. § 800.05(a)(1).  An example of an

adverse effect is the introduction of visual or atmospheric elements that diminish the integrity of

the property's significant features. 36 C.F.R. § 800.05(a)(2)(v).  Adverse effects also include

physical destruction or damage to the property or alterations not consistent with the Secretary's

standards for the treatment of historic properties.  36 C.F.R.§ 800.5(a)(2)(i) and (ii).

The agency may propose a finding of no adverse effect when the undertaking's effects do

not meet the criteria of paragraph (a)(1).  36 C.F.R.§ 800.5(b).  If the agency finds no adverse

effect, then the agency must notify all consulting parties of the finding and provide them with the

documentation specified in § 800.11(e.)  The SHPO and other consulting parties then have 30

---

[4]  Consulting parties are defined as the SHPO, Indian tribes and Native Hawaiian organizations, representatives of local government with jurisdiction over the area, applicants for federal assistance, permits, license and other approvals, and additional consulting parties. 36 C.F.R. § 800.2(c). Additional consulting parties are "certain individuals and organizations with a demonstrated interest in the undertaking . . . due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties." 36 C.F.R. § 800.2(c)(5).  The agency is only required to consult with the additional consulting parties, however, if the consulting party requested participation in writing and the agency determined that they should be granted consulting party status.  Mid States Coalition for Progress v. Surface Transp. Bd., 345 F.3d 520, 553 (8th Cir. 2003) (citing 36 C.F.R. § 800.3(f)(3)).  There is no documentation within the administrative record to suggest that plaintiff Neighborhood Association of the Back Bay ("NABB") ever requested in writing to become a consulting party, although a representative from NABB attended a 1997 meeting about the project.  AR685.

days to review the finding.  Id., § 800.5(c) (2000).  If the SHPO agrees with the finding of no

adverse effects, then the agency may proceed with the undertaking and its duties under § 106 are

fulfilled.  §§ 800.4(d)(1)(ii), 800.5(c)(1).

The regulations require a written notification by the federal agency to the SHPO

accompanied by documentation supporting the agency finding.  Comm. to Save Cleveland's

Huletts, 163 F. Supp. 2d at 790-91.  Pursuant to the regulation, an agency official is required to

support a determination, finding or agreement with sufficient documentation to enable any

reviewing parities to understand its basis.  § 800.11(a).  Whether the agency finds there are

adverse effects or no adverse effects, the document must include, *inter alia*, a description of the

undertaking and its area of potential effects; a description of the affected historic properties; a

description of the undertaking's effects on historic properties; an explanation of why the criteria

of adverse effects were found applicable or inapplicable, including any conditions or future

actions to avoid, minimize or mitigate adverse effects; and copies or summaries of any views

provided by consulting parties and the public.  36 C.F.R. § 800.11(e).

The SHPO must be given a "reasonable opportunity to comment" on the effect of the

federally funded program on the historical site.  Concerned Citizens Alliance v. Slater, 176 F.3d

686, 695 (3d. Cir. 1999).  While the agency must take into consideration the SHPO's comments

regarding the effect of the undertaking on the historic site, id., the ultimate conclusions rest with

the agency.  Id. at 695-696.  Section 106 requires continuing consultation at each stage of the

undertaking.  WATCH v. Harris, 603 F.2d 310, 325-326 (2d Cir. 1979), cert. denied, 444 U.S.

995 (1979).  Nonetheless, there is no requirement of a final concurrence before an agency may

proceed with the project.  See 36 C.F.R. §60.2(a); Concerned Citizens Alliance, Inc., 176 F.3d at

695.  A determination of "no adverse impact" under § 106 will be reviewed under an arbitrary and capricious standard.  Aertsen v. Landrieu, 488 F. Supp. 314, 318 (D. Mass. 1980), aff'd 637 F.2d 12 (1st Cir. 1980).

## 49 U.S.C. § 303 ("Section 4(f)")

Plaintiffs also allege a violation of Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c) (1994) (originally codified at 49 U.S.C. § 1653(f) (1970)).  Section 4(f) requires DOT to avoid approving a project that uses the land of a protected resource unless there is no feasible and prudent alternative to such use.  49 U.S.C. § 303(c).[5]

In general, Section 4(f) requirements only apply to sites on or eligible for the  National Register of Historic Places ("National Register"). 23 C.F.R. § 771.135(e).  The Secretary must consult with the SHPO and appropriate local officials to identify all properties on or eligible for the National Register.  Id.  By its terms, the statute only provides Section 4(f) protection to historic sites  when they will be "used" in the course of the transportation project.   49 U.S.C. §303(c).  See National Trust for Historic Preservation in U.S. v. Dole, 828 F.2d 776 (D.C.Cir.

---

[5] Section 4(f) provides in relevant part that:

The Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if- -

(1)    there is no prudent and feasible alternative to using that land; and

(2)    the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c).

1987).  If the proposed project constitutes a "use" of a historical site, the project may not be approved unless there are no prudent and feasible alternatives to the use of the land and the project includes all possible planning to minimize the harm.  Id.  Thus, compliance with § 4(f) proceeds in three stages.  First, the agency identifies which resources are protected.  Second, the agency determines whether a proposed project will "use" the lands identified.  If not, further 4(f) requirements are not triggered.  If the project does use the challenged site, however, then the agency may not proceed with the project unless it complies with Section 4(f)'s requirements.  49 U.S.C. § 303(c); 23 C.F.R.§771.135(a).

A "use" can be direct or constructive.  A direct use occurs "[w]hen land is permanently incorporated into a transportation facility," and a constructive use occurs when the project does not incorporate land from a Section 4(f) resource, but "the project's proximity impacts are so severe that the protected . . . features or attributes that qualify a resource for protection under section 4(f) are substantially impaired."  See 23 C.F.R. §§ 771.135(p)(1)(i) and (p)(2).  In other words, a site is "'used' for Section 4(f) purposes "whenever land from or buildings on the site are taken by the proposed project, or whenever the proposed project has significant adverse . . . impacts on or around the site. . . ."  Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982).  The term "use" is construed broadly and is "not limited to the concept of a physical taking, but includes areas that are significantly, adversely affected by the project."  Id. at 1092 (emphasis added).  Hence, "[n]o 'use' will be deemed to have occurred where an action will have only an insignificant effect on the existing use of protected lands."  Allison v. Dep't of Transp., 908 F.2d 1024, 1028 (D.C.Cir.1990) citing Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 130 (D.C.Cir.1985).  See Town of Belmont v. Dole, 766 F.2d 28, 31 (1st Cir.1985) (observing

that "the word 'use' in the statute refers to a use that is *adverse* in terms of the statute's

preservationist purposes, a 'use' that might '*harm*' the resources the statute seeks to protect.");

Stewart Park and Reservation Coalition, Inc. v. Slater, --- F.Supp.2d ----, 2005 WL 469359 at

*15 (N.D.N.Y. Feb 25, 2005) (same).

If the proposed project will not directly or constructively "use" the historic site, § 4(f)

requirements are not applicable and the agency is not required to examine alternative sites nor

minimize harm.   Geer v.  Fed. Highway Admin., 975 F. Supp. 47, 67 (D. Mass. 1997).

Compliance with § 4(f) is predicated on compliance with § 106.  Valley Cmty. Pres. Comm'n,

373 F.3d at 1085.  The plaintiff has the burden to allege facts that, if taken as true, would show

that the project will "use," in some significant way, a historic site.  Citizen Advocates for

Responsible Expansion, Inc. (I-Care) v. Dole, 770 F.2d 423, 441 (5th Cir. 1985) citing Save Our

Ten Acres, 472 F.2d at 466; Adler, 675 F.2d at 1092.  A section 4(f) evaluation may be set out in

a separate document, or may be contained in the final EIS or FONSI pursuant to NEPA.  23

C.F.R. § 771.135(j).[6]

**The Administrative Procedures Act, 5 U.S.C. §§ 702, *et seq*.**

---

[6]  Although not invoked in the Second Amended Complaint, a third statute implicated by this case is the National Environmental Policy Act ("NEPA").  42 U.S.C. § 4332.  NEPA requires all agencies to develop a detailed environmental impact statement ("EIS") before undertaking a major federal action significantly affecting the quality of the human environment.  42 U.S.C. § 4332(c).  The detailed statement must include the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided, alternatives to the proposed project, the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity and any irreversible and irretrievable commitments of resources.  42 U.S.C. § 4332(c).  NEPA regulations permit agencies to conduct an "environmental assessment" ("EA") to determine whether the EIS is required; if not, the agency must explain its determination in a "finding of no significant impact"("FONSI").  Save Our Heritage, Inc., 269 F.3d at 57 (citing 40 C.F.R. § 1501.4 (2000)).  If, based on the EA findings, the agency determines the proposed action will not have a significant impact on the environment, an EIS is not required.  S. Utah Wilderness Alliance v. Norton, 326 F. Supp. 2d 102, 116 (D.C. Cir. 2004).  Here, the FTA's 4(f) determination was set out in its FONSI, AR748, and thus plaintiffs challenge the FONSI. *Second Am. Compl.* ¶¶ 20-21, 32-34, 44-52.

There is no independent cause of action under § 4(f).  <u>Valley Cmty. Pres. Comm'n</u>, 373

F.3d at 1084.  This Court's jurisdiction to review Count II thus arises out of the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 702, 706.  That is, plaintiffs alleging violations of § 4(f)

must sue under the APA.[7]  <u>Geer</u>, 975 F. Supp. at 58.  Under the APA, a final agency decision

will only be set aside if the decision was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law or if the action failed to meet statutory, procedural, or

constitutional requirements."[8] <u>Citizens to Preserve Overton Park, Inc. v. Volpe,</u> 401 U.S. 402,

414 (1971) (internal quotations omitted).

<u>**AGENCY PROCEEDINGS AND FINDINGS**</u>

In 1992, the Arlington Street MBTA station was designated a "key station," requiring

improvements to make the station accessible to persons with disabilities.  AR001, 004-6, 049-50.

At that time, the MBTA requested an extension until 1998 to make the improvements.  AR049-

50.  On May 13, 1993, the MBTA submitted a budget for the proposed improvements to the key

stations.  AR102.  On June 4, 1993, the FTA notified the MBTA that the proposed budget and

extension date until 1998 had been approved.  AR106.  In a July 1997, community meeting about

the project, all four corners of the intersection, including a site adjacent to the Arlington Street

Church, were rejected as a site for the elevator for various reasons.  AR270.  On November 21,

---

[7]  Plaintiffs do not allege that the claims based on Section 4(f) (Count II) are brought pursuant to the APA.  Indeed, plaintiffs have not invoked the APA at all.  Oddly, however, plaintiffs recite 42 U.S.C. § 1983 as a basis for this Court's jurisdiction.  *Second Am. Compl.*¶ 9.  Any purported claim against the FTA under §1983 should be dismissed, as that statute does not provide a cause of action against <u>federal</u> actors.  <u>See, e.g.,</u> <u>Rogers v. Vicuna</u>, 264 F.3d 1, 4 (1st Cir. 2001) (holding that § 1983 cannot form the basis of an action against individuals acting under color of federal law) <u>citing</u> <u>Chatman v. D.E. Hernandez</u>, 805 F.2d 453, 455 (1st Cir.1986) ("Section 1983 applies to persons acting 'under color of state law' and not to persons acting pursuant to federal law.").

[8] The standard of review for both Count I and Count II therefore is the same.

10

1997, the MBTA submitted a site analysis by its architects pertaining to the Arlington Street Station.  AR124-161.  That assessment included, *inter alia*, a new proposed site on Boylston Street (site "B2"), down from the corner, adjacent to the Arlington Street Church Parish House.  AR141, 142.  On June 30, 1998, the MBTA requested an extension for the Arlington Street Station until 2003, citing, among the reasons for delay, abutter "resistance on all fourteen proposed alternatives" for location of the surface to mezzanine elevator.  AR163.   Again on October 26, 1998, the MBTA explained that "[i]dentifying the location of the . . . elevator has caused additional delays in the design process."  AR167.  On July 2, 1999, the MBTA reported to the FTA that an elevator site "adjacent to the Arlington Street Church Parish House" (site "B2") had been approved, and that both the City of Boston Public Works and Boston Transportation Departments "were very pleased with the proposed location."  AR169.  At that time, the MBTA predicted that the design would be complete "by spring 2000," and that construction would commence "in the summer of 2000," and be completed by December, 2003. Id., AR172.

In a 2001 summary of the project history the MBTA explained that in July 1997 all four sites initially proposed "were rejected," including one adjacent to the Arlington Street Church, and the corner adjacent to Shreve, Crump & Low, which was not only "not acceptable to the abutter," but also "was not desirable due to the narrow seven-foot wide sidewalk at that location."  AR270, 680-685.  The summary also describes analysis of six additional proposed sites, explaining why five were rejected, and stating that moving the elevator site 120 feet west from the Arlington Street corner, close to the Arlington Street Church Parish House, was "the one acceptable solution" at the second community meeting held in April 1998.  AR270.

According to the design for that location, the new stair and elevator kiosk will be located on a public way in the "continuity strip" between the sidewalk and the street, so that the existing sidewalk width will be maintained. AR406. The 1997 site assessment submitted by the MBTA shows that the location selected in 1999 for the elevator had the most (45%) pedestrian entries and exits.[9] AR130. See AR160, 405, 435.

On or about September 30, 1999, the MBTA submitted an "Application for Federal Assistance" to the FTA for funds to carry out, *inter alia*, the Arlington Street Station accessibility improvements. AR174-88. In a March 10, 2000, internal report on the status of key stations for which the MBTA had received extensions beyond 2001, the FTA reported that "[m]any community meetings were held" and "ten alternatives were investigated" over several years to arrive at an accessibility design for the Arlington Street Station, and that the location of the elevator had been problematic. AR259. On June 8, 2001, the SHPO, the Massachusetts Historical Commission ("MHC") provided detailed comments on the proposed head-house and elevator kiosk designs following review of a scale model and site visit. AR265-66. In that letter, the SHPO advised FTA that it holds a preservation restriction on the Arlington Street Church. Id.; see also AR736. In October, 2001, the MBTA hosted a meeting to have a formal Section 106 review with the FTA and MHC. AR268.

In a December, 2002 letter to MHC, the FTA explained that in its view Section 4(f) requirements did not apply to the work at the Arlington Street Station because the FTA had

---

[9] As plaintiffs recognize, *Plaintiffs' Memorandum* at 10, n. 6, in order to make the station ADA compliant, the stair and elevator must be placed to "minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public. The circulation path, including an accessible entrance and an accessible route, for persons with disabilities shall, to the maximum extent practicable, coincide with the circulation path for the general public." 49 CFR Part 37, Appendix A, sections 10.3.1 and 10.3.2.

found, pursuant to 23 C.F.R. § 771.135(f),[10] that the proposed work would not adversely affect

the historic qualities of the Arlington Street Church.  AR369.  The FTA attached a draft EA

prepared by the MBTA.  AR370-436.  In the EA, the MBTA summarized the background of the

project and explained, *inter alia*, that because of the historical significance of the area, the

MBTA had involved The Boston Landmarks Commission ("BLC"), Boston Parks Department,

and the MHC "since the beginning" in order to ensure that the design was "appropriate and

sensitive to its environment," AR374, and had coordinated design issues with the MHC and

BLC.  AR382, 383.   The draft EA also explained that in addition to siting the elevator and stair

structures to "minimize their visual impact" on the Arlington Street Church, the kiosk and

stairwells were designed to be "similar to the Public Garden fence," and would be enclosed in

glass with a steel structure "made as small and transparent as possible to minimize visual

impact."  AR382.   The proposed project also included  measures to mitigate construction

activity on the church grounds, including restoring a granite garden wall "back to its historic

location" and providing a new fence "more in keeping with the historic fence," in addition to

construction of an ADA-compliant access ramp to the Church itself.  AR375.  The EA listed nine

agencies with which the MBTA had met in the course of the project, and over thirty agency and

community meetings that had been held.  AR385-88.   In January 2003, the MHC responded to

the December 2002 letter, reporting its concurrence with the FTA's determination.  AR460.

    After taking into account the two comment letters that were received in response to the

draft EA, AR706-07, the MBTA asked the FTA to accept the draft EA as the final EA for the

project.  AR708.  On May 14, 2004, after review of the MBTA's EA, the FTA issued a Finding

---

[10] The citation at AR369 to §771.135(f) is an error.  The applicable section is 771.135(p).

of No Significant Impact.   AR744-48.

## THE STANDARD OF REVIEW

Agency findings pursuant to Section 4(f) are only reviewable under the APA.  See

Valley Cmty. Pres. Comm'n, 373 F.3d at 1084;  Geer, 975 F. Supp. at 58.  Long-established case

law provides that upon review under the APA, agency action may not be overturned unless

found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

Id.  A challenge brought under Section 106 is also reviewed under the APA's "arbitrary and

capricious" standard.  See  Concerned Citizens Alliance, Inc., 176 F.3d at 694; Aersten, 488

F.Supp. at 318.  The task of a court reviewing agency action under the APA's 'arbitrary and

capricious' standard is a narrow one: "to determine whether the agency has examined the

pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for

its action including a rational connection between the facts found and the choice made." Airport

Impact Relief v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999) (citations and quotations omitted).

The court may not substitute its own judgment for that of the agency.  Id. at 58.

Administrative actions taken under § 4(f) of DOTA are subject to a highly deferential

abuse of discretion standard of review.  Conservation Law Found. v. Fed. Highway Admin., 24

F.3d 1465, 1471 (1st Cir. 1994).   While an agency's 4(f) determinations are subject to "a

through, probing, in-depth review," Overton Park, 401 U.S. at 415, the court reviews the record

only to insure that there was "consideration of the relevant factors and [no] clear error of

judgment. . . ." Geer at 75.  Courts have focused primarily on reviewing an agency's substantive

finding to ensure that the agency "looked hard at the pertinent facts and thought hard about the

relevant factors." Burlington, 938 F.2d at 203; see also Eagle Found., Inc. v. Dole, 813 F.2d

798, 803 (7th Cir. 1987).  As long as the agency conducts the appropriate steps, the court must

accept the determinations.  Id.  Alternatives must be sufficiently set forth to permit a reasoned

choice, but the agency is not required to have "considered in detail each and every conceivable

variation of the alternatives stated."  Id.  "Section 4(f) does not require the Transportation

Secretary to set forth specific findings and reasons for approving a project that will use land from

parks or historic sites."  Stop H-3 Ass'n v. Coleman, 533 F.2d 434, 445 (9th Cir. 1976).

Thus, an agency's findings will only be found to be arbitrary and capricious if the agency

relied upon factors which Congress did not intend it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise.  Burkholder v. Wykle, 268 F. Supp. 2d 835, 840 (N. D.

Ohio 2002), aff'd, Burkholder v. Peters, 58 Fed. Appx. 94 (2003).  As long as the agency

complied with the statutory procedure and the record supports the finding, the agency's decision

should be given "substantial deference."  Id.

## ARGUMENT

This action represents a last-ditch effort by the plaintiffs to block long-overdue

accessibility improvements to an MBTA key subway station, based on plaintiffs' disagreement

with the FTA's conclusions.  The attempt fails.  Plaintiffs misconstrue the regulatory

requirements of the two statutes they invoke, and simply ignore record evidence that the FTA:

reached a reasoned conclusion based on plans, studies, and reports showing that there was

neither a direct nor constructive "use" triggering Section 4(f) protections; and followed the

procedural consultation requirements of the NHPA, thoroughly considering historic preservation

15

concerns as mandated by Section 106.  The finding of no adverse impact is amply supported, and earned the concurrence of the SHPO, as well as approval of the Church, the BLC, and the Boston Public Works and Transportation Departments.  E.g., AR169, 259, 460, 574, 679, 704.

A.    **Plaintiffs Have Not Alleged Facts Sufficient to Show They Have Standing to Sue Under the APA or Section 106.**

As an initial matter, plaintiffs have not met their obligation to demonstrate their standing to bring this claim.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (a plaintiff challenging the legality of government action bears the burden of establishing that he has standing to challenge the action).  Under the APA, plaintiffs have standing to seek a review of an agency's final decision if they have "alleged that the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies have claimed to have violated." Sierra Club v. Morton, 405 U.S. 727, 733 (1972) ("Morton").   A "mere interest in a problem" is not sufficient to establish standing, rather the plaintiff must allege facts showing that they themselves were adversely affected.  Morton, 405 U.S. at 739.  In applying the "zone of interest" test, courts ask which interests are to be protected by the statute and "whether the plaintiff's interests affected by the agency action in question are among them."  Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 73 (1st Cir. 2001) (internal citations omitted) (citing Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998)).  An individual plaintiff can establish that she will suffer harm from a construction project by demonstrating "adequate proximity to and use of" the land in question.  Valley Comty. Pres. Comm'n, 373 F.3d at 1086.  Similarly, to have standing under the NHPA, plaintiffs must establish, *inter alia*, that they have suffered a concrete and particularized "injury-in-fact" which is "actual or imminent,

16

not conjectural or hypothetical." Id. at 73.  Plaintiffs can satisfy the injury requirement by

"showing harm to the aesthetic and environmental well-being of the Plaintiff."  Weintraub v.

Rural Electrification Admin., 457 F. Supp. 78, 88 (M.D. Pa. 1978) (citing United States v.

SCRAP, 412 U.S. 669, 686 (1973)); see also Morton, 405 U.S. at 734-5 ("[T]he 'injury in fact'

test requires. . . . that the party seeking review be himself among the injured").

Plaintiffs here fail to allege any injury to NABB or its members.  In the Second Amended

Complaint, plaintiffs' only allegation of harm is the general lament that the "proposed entrance

will partially block the view of the Arlington Street church."  *Second Am. Compl.* ¶ 22(a).  But

plaintiffs fail to make any allegation that they themselves will be adversely affected by the

partial obstruction.[11]  Beyond alleging the street addresses for (most of) the individual plaintiffs,

plaintiffs do not allege proximity or use; they simply do not even mention how a partially

obstructed view will cause them an injury in fact.[12]  Indeed, plaintiffs have not alleged any facts

---

[11] Plaintiffs also baldly assert that siting the elevator kiosk by the Church will have an adverse effect on the Back Bay Historic District, not just the Church and immediate area, *Plaintiffs' Memorandum* at 11-13, 14-15, but they do not describe how, or argue how that will injure any plaintiff.  To the extent plaintiffs may be attempting that argument, it fails.  This is not a proposal to raze the Church building, or cover it with fiberglass siding, actions that might arguably have a district-wide effect.  The suggestion that a 9' 8-1/2" x  8' 13" x 13' 6" glass-faced elevator kiosk, AR743, designed specifically to be a "respectful, muted neighbor" of the historic Church, AR376, will instead diminish the architectural integrity of the entire Back Bay Historic District, is incredible.  The structures will be placed on a commercial street, see AR142 (showing retail establishments such as "Tweeter," "Jennifer Convertibles," and the "Rattlesnake Bar & Grille," some located in storefronts of "modern" design), that already has several stairwell 'T' entrances, AR393, and the project will eliminate one "existing bunker-like brick structure at the corner of Arlington and Boylston that currently obtrudes on the historic view of the Church."  AR720.  By plaintiffs' logic, the new kiosk could not be placed anywhere in the Back Bay,  yet this project will improve the primary view of the Church.  See 23 C.F.R. § 771.135(p)(4)(ii).

[12] None of the plaintiffs are alleged to attend the church, or to own property in view of the Church.  No plaintiff alleges that the view of the Church from his or her residence will be affected.  The street addresses alleged in the Complaint indicate that for at least two of the individual plaintiffs, the Arlington Street Station is not even their closest subway station, but instead Copley Station or Back Bay Station provide their closest access to the subway.

that distinguish them from any passerby, resident or tourist, who might possibly walk down

Boylston Street and look over to the Church, but who would not thereby have standing to bring

this action.  Plaintiffs' scant and general allegations are insufficient to establish standing.

**B.    Defendant FTA Acted Within its Authority, Satisfied the Procedural and Substantive Requirements of Both Statutes, and After Thorough Review Made a Reasoned Decision About the Project That is Fully Supported by the Record.**

**1.    The FTA Properly Determined That Section 4(f) Requirements Were Not Triggered by the Project.**

Plaintiffs stake their argument of a violation of Section 4(f) on an alleged failure by the

FTA to consider "feasible and prudent alternatives" to the siting of the elevator kiosk.  *Plaintiff's*

*Memorandum* at 1, 2, 19-20.  This argument fails, since under the statute and regulations the

FTA properly determined there would be no "use" triggering Section 4(f) protections.  Having

made that determination, the FTA satisfied its obligations under 4(f) and was not required to

consider every possible alternative.  Where, as here, a proposed project does not constitute a

"use," then further analysis of whether there are feasible and prudent alternatives, and whether

the project mitigated harm, is not necessary.  <u>Geer</u>, 975 F. Supp at 67.

**a.    There is no Direct Use.**

The FTA properly determined that the project "will not adversely affect the historic

qualities of the facility that caused it to be on or eligible for the Historic Register."  23 C.F.R.

§ 771.135(f)(1).  Implicit in that assessment is that the churchyard was not part of the historic

site subject to 4(f) requirements.  First, there is nothing in the record to indicate, and plaintiffs do

not contend, that there will be a direct use of the church building itself.  Based on the project

plans, there could only have been a <u>direct</u> use of the church grounds.  As described in the Draft

EA, the project includes the acquisition of a permanent easement of 100 square feet (SF) of

Church property for a vent, grille, and skylight flush to the ground to allow light to shine into the pedestrian tunnel below.  In addition, the project will require a temporary construction easement of about 4000 SF on the Churchyard.[13]  AR380, 394, 724.

The church grounds, however, as opposed to the building itself, are not of historic significance or part of the Historic Register.  AR754-59.  The record shows that the surface restoration of the church garden would include bringing the granite wall "back to its historic location" at the property line and the addition of a new painted steel fence that would be "more in keeping with the historic fence."  AR719.  See diagram at AR395, 742.  The existing wall will be replaced with a wall consistent in color and texture with the brownstone of the Church.  AR532-534, 547. These improvements demonstrates that the existing churchyard has been so modified over the years that it no longer retains the integrity of its original historic configuration.  Moreover, the preservation restriction agreement executed in 1989 and the application by the SHPO to nominate the Church to the National Register in 1973 indicate that the "historic significance" of the church encompasses its religious philosophy and the architecture of the building itself, but not the land on which it is situated.  AR754-59.   Although the FTA does not state explicitly in its letter to the SHPO or its FONSI that there is no direct 4(f) use, that conclusion is implicit in its finding of no adverse effect, and in the SHPO's concurrence, since paving some of the surface and installing a skylight on 100 square feet of church land would have destroyed the historic features if they still existed.  Instead, this project will restore the churchyard to a condition more in keeping with its historic state.  In any event, plaintiffs do not

_____

[13] According to the EA, "this area, part of the National Historic Landmark, will be fully restored." As noted above, the reference to the church as an NHL is erroneous.  See note 1, supra.

allege a direct use of the land, but complain only of visual obstruction of the building.  E.g.,
*Second Am. Compl.*, par. 12; *Plaintiffs' Memorandum* at 12, 14, 15-16.  Their claim is therefore
premised on an alleged constructive use.

> **b.    There is no Constructive Use**.

Neither is there a constructive use under Section 4(f).  Although "use" "is not limited to
the concept of a physical taking," a constructive use means there are "areas that are <u>significantly
adversely affected</u> by the project."  <u>Adler</u>, 675 F.2d at 1092 (emphasis added).  Since there is no
indication in the record of a significant adverse effect, based on the information before the FTA
it properly concluded that Section 4(f) requirements were not triggered.

A "constructive use" occurs when "the transportation project does not incorporate land
from a § 4(f) resource, but the project's proximity impacts are so severe that the protected
activities, features or attributes that qualify a resource for protection under § 4(f) are
<u>substantially impaired</u>."  <u>Geer,</u> 975 F. Supp. at 72, <u>citing</u> 23 C.F.R. § 771.135 (p)(2) (emphasis
added).  The 4(f) regulations explicitly provide that substantial impairment "occurs <u>only</u> when
the protected activities, features, or attributes of the resource are <u>substantially diminished</u>." 23
C.F.R. § 771.135 (p)(2)  <u>Id.</u> (emphasis added).   The record amply supports a determination that
there will be no substantial impairment of the church's esthetic features from the project at issue,
and so the FTA's conclusion was reasonable, proper, and entirely in keeping with the evidence
before it.

Plaintiffs' claim rests on the placement of an elevator kiosk "adjacent to" the Arlington
Street Church, *Plaintiffs' Memorandum* at 1-2, 3, that "obstructs" or "partially obstructs" the
view of the church.  <u>Id.</u> at 12, 14, 15.  Thus, the only basis on which Section 4(f) could apply to

plaintiffs' claims is a constructive use based on "proximity impacts" or visual intrusion. But plaintiffs cannot show that proximity impacts "substantially diminish" or "substantially impair" the historic features of the church.

Although they invoke the Section 4(f) regulations, id. at 14, plaintiffs fail to consider the specific guidance and examples provided in those regulations to help an agency evaluate whether a project will result in a constructive use based on proximity impacts. Nowhere in their brief do plaintiffs even attempt to reconcile the explicit touchstones set out in the 4(f) regulations with the record evidence showing the partial obstruction here falls far short of a constructive use of the building. The regulations provide that a constructive use occurs when:

> the proximity of the proposed project substantially impairs esthetic features or attributes of a resource . . . where such features or attributes are considered important contributing elements to the value of the resource. Examples of substantial impairment . . . would be the location of a proposed transportation facility in such proximity that it obstructs or eliminates the primary views of an architecturally significant historical building. . . .

23 C.F.R. §771.135(p)(4)(ii).[14] Here, the elevator will be located 120 feet back from the corner of Arlington Street, at the side rear of the Church, adjacent to the Parish House, and the stairway is even farther from the corner. See AR395. The record thus shows that the staircase and glass-faced elevator kiosk will not eliminate or obstruct the primary view -- the front entrance from Arlington Street, see AR762 -- of the architecturally significant building.[15] Even if the rear side view of the church on Arlington Street could be considered the "primary view," the obstruction

---

[14] See also 56 FR 13274 ("The visual impact must be substantial, such as when a proposed facility would dominate the immediate surroundings, interfering with primary views of or from the resource.").

[15] Plaintiffs appear to concede the front entrance is unobstructed. See *Plaintiffs' Memorandum* at 12 (The EA omits "direct reference to the interference of the view of the historic church across Boylston Street").

cannot reasonably be called "dominating" or substantial.  AR395.  The minimal intrusion here,

see AR395, simply does not rise to the level of a constructive use under § 4(f).[16]

Moreover, under 23 C.F.R. § 771.135(p)(5)(i), there is no constructive use when the

§ 106 analysis results in an agreement of no adverse effect.  23 C.F.R. § 771.135(p)(5)(i).[17]

Here, the SHPO reported its concurrence with the FTA's determination of no adverse effect in

January 2003.  AR460.  Since the MHC concurred with the FTA's Section 106 conclusion that

the project did not adversely effect the Church, there was no constructive use under § 4(f).

Since there was neither a direct nor constructive use of the Arlington Street Church, the

FTA properly concluded, and the SHPO concurred, AR460, that the project would not adversely

affect the church's historic qualities.  Plaintiffs have made no demonstration otherwise.  The

Section 4(f) requirements that plaintiffs claim were ignored, in fact were not even triggered.

There is ample evidence in the record to support a determination that the project's impacts do not

rise to the level of constructive use.  See Geer, 975 F.Supp. at 74 (no constructive use when there

was not a sufficient change in the character and magnitude of the property).  The FTA's

conclusion was neither arbitrary nor capricious.  The FTA is entitled to judgment on Count II.

---

[16]  The diagram at AR395 illustrates, *inter alia*, that the elevator kiosk is dwarfed by the height
and stateliness of the Church, and makes clear that the impact of the elevator is not significant,
particularly since the street is a busy commercial one, and the view of the church from across Boylston
Street is blocked on an almost constant basis with commercial and other vehicles.

[17]  Indeed, at least one court has held that even a finding of an adverse effect under Section 106
does not compel a finding of constructive use under Section 4(f).  See Piedmont Environmental Council
v. U.S. Dept. of Transp., 159 F.Supp.2d 260, 284 (W.D.Va. Aug 21, 2001).

**2.     Even If the Court Determined Section 4(f) Applies, Judgment for the FTA is Still Appropriate Because All Feasible and Prudent Alternatives Were Considered, and There Was Thorough Planning to Minimize the Impact.**

Even were the Court to determine that the projected visual obstruction will create a constructive use of the Church, so that Section 4(f) protections were triggered, the Court should nonetheless rule that the FTA fulfilled those requirements, and grant summary judgment for the FTA. The record demonstrates an extended process of analysis by the MBTA, involving the community and relevant local agencies. AR680-90. Fourteen proposed sites for the elevator were considered over a period of many months. AR163. The first four sites proposed were at the four corners of the intersection. AR270. All were rejected for a variety of reasons. Id.; AR680-83. One of plaintiffs' two principal arguments, made particularly in their "Facts" section, is that the only reason the so-called Shreve, Crump & Lowe option was rejected was that the abutter who owns those parcels, Ronald Druker, objected. *Plaintiff's Memorandum* at 2, 3-11, 16-18, 20-21. Plaintiffs ignore key evidence in the record, however, that severely undercuts their allegation. First, virtually everyone at the first community meeting in July 1997, attended by a NABB representative, in addition to representatives from the MHC, BLC and Back Bay Architectural Association ("BBAC"), objected to siting the elevator at any of the four corners. AR680-90. The Church itself objected to placing the elevator in the front of its building at the corner, as did the BBAC, BLC, and Ronald Druker (who objected to siting the elevator at any of the corners, including the corner at the front of the Church, AR686), because it would obstruct the historic view of the Church.[18] AR680-90. That site was rejected. It is nonsense to suggest

_____

[18] The representative from the Arlington Street Church argued for moving the elevator down from the corner on Boylston Street – to a mid-block location between Arlington and Berkeley. AR682. Although the location chosen is not literally in the middle of the block, it is down from the corner, 120 feet away from the front view of the church, in the direction the Church suggested and at a site acceptable

that community and abutter concerns may not be taken into account in identifying feasible sites, and the regulations under Section 106 not only anticipate but require consideration of such input. See, e.g., 36 C.F.R. § 800.2(c); § 800.3(e).[19]   See also M.G.L. c. 161A, §5(k).

Second, plaintiffs' argument that the so-called "non-Druker" reasons for not choosing another site are *post hoc* rationalizations not supported by the record, *Plaintiffs' Memorandum* at 10-11, 16-17, completely fails, because it ignores evidence of problems with other sites that were identified from the outset.  E.g., AR680-90.   Since the purpose of the project was to provide access to the station for persons with disabilities, results of pedestrian traffic studies, along with issues concerning the width of the sidewalks and traffic effects, were considered early in the process, including at the July 1997 meeting attended by a NABB representative.  AR680-85.   A site is not feasible if necessary approvals could not be obtained,[20] nor prudent if it causes patrons in wheelchairs to have to travel farther than the general public, including across a busy intersection, *e.g.*, AR688, 689, to enter the station.   Courts have uniformly held that alternatives that do not meet the project purpose and need are not "prudent," and therefore need not be considered further in the Section 4(f) process.  See, e.g., Hickory Neighborhood Def. League v.

---

to the congregation.  AR395; 142, 704.

[19] Plaintiffs suggest that abutter concerns are equivalent to political pressure from members of Congress and, relying on a single 1972 case, argue that is a "pressure" that may not be taken into account under the statute.  *Plaintiffs' Memorandum* at 17-18.  Ironically, NABB itself attempted to involve its State Representative and other politicians in its 2003-2004 arguments to the MBTA and FTA against the site selected.  AR551, 562-63, 564-66, 596-98, 654-56,   Moreover, in 2003 and 2004 NABB argued vigorously that the elevator should be put in front of the Public Garden, a National Historic Landmark.  AR375, 550, 654-56.  These facts suggest plaintiffs' present arguments are somewhat disingenuous.

[20] Also at the July 1997 meeting, a representative from the City of Boston's Public Improvement Commission, from which some project approvals would be needed, observed that he wanted to see "community agreement" before the project came up before his agency.  AR682.

Skinner, 910 F.2d 159, 164 (4th Cir. 1990); Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 203 (D.C. Cir. 1991).  The alternative proposed by NABB in 2004, to locate the elevator near the Boston Public Garden, AR654-66, was one that proved to be infeasible early on. AR677-79.  On the other hand, after more than ten possible sites were rejected as problematic, the site selected was reviewed and accepted by the SHPO, the BLC, the Church, and both the Boston Transportation and Public Works Departments.  AR169, 324, 375, 460.

Moreover, the MBTA was already in violation of its voluntary compliance agreement and past its extension for making the station accessible.  E.g., AR166, 167-68, 341, 658-59, 666, 677-78.  The possibilities for siting elevator access to the Arlington Street station, a station on the oldest subway line in the country, AR016, were not limitless.  The FTA's approval of the site selected, taking into account a simple, glass-faced design, AR742-743, accepted by the SHPO, the BLC, and the Church itself, was entirely reasonable, thoughtful, and supported by the studies, site assessments, and information in the record.  AR126, 277, 376, 379, 704, 720.  See Comm. to Preserve Boomer Lake Park v. Dept. of Transp., 4 F.3d 1543, 1551 (10th Cir. 1993) (explaining that an agency's obligation under Section 4(f) 'is to examine enough alternatives 'to permit sound judgment that the study of additional [alternatives] is not worthwhile'").

Finally, even if Section 4(f) applied, the record amply supports that there was all possible planning to minimize the effects of the project.  First, the site in front of the Church at the corner of Arlington and Boyslton Streets was rejected, as was the Public Garden site, both historically significant.  Second, the Parish House site was acceptable to the Church, MHC, BBAC, and BLC.  Third, relevant local agencies were involved in the design process, and changes to the elevator kiosk were made in response to their concerns.  E.g., AR265, 277-79, 392, 532-33, 737.

The structure is as small as possible, and the glass-faced enclosure is designed specifically to minimize the visual obstruction.[21]  AR376, 379.  The churchyard will be restored to more closely resemble its historic condition.  AR375.  In light of the exhaustive process to select the most feasible site, the extensive planning to design the least obtrusive kiosk, and considering the record as a whole, the FTA's decision to approve the plans was not arbitrary nor capricious.  The Court should deny plaintiff's motion and enter judgment for the FTA on Count II.

3.  **The FTA Followed the Procedural Mandates of Section 106, Consulted With the SHPO, and Made a Reasoned Determination of No Adverse Impact that is Fully Supported by the Record.**

Plaintiffs have failed to meet their burden in their Section 106 challenge to the FTA's determination of no adverse impact.  Although they clearly disagree with the <u>conclusion</u> reached by the FTA, they have not demonstrated that the FTA did not follow the procedural mandates of the statute, but instead focus their argument entirely on the outcome.  See *Plaintiffs' Memorandum* at 1 ("despite . . . detailed regulations clarifying the steps agencies must take the [] FTA found 'no adverse effect. . . .'"); 14-15 ("The problem is that the FTA has determined that the construction of a 13 foot tall elevator headhouse . . . partially obstructing the view of the Arlington Street Church has no adverse effect on the historic nature of the historic church building. . . .).  Plaintiffs do not point to any steps required by Section 106 that the FTA failed to complete.  They ignore substantial evidence in the record as a whole, offering only "gauzy generalizations and pin-prick criticisms," <u>Save Our Heritage</u>, 269 F.3d at 60, which fall far short of demonstrating a Section 106 violation.

---

[21] <u>See</u> AR376 ("the steel structure and glazing frames [are] designed to reflect the proportions of the bay and window system in the church. . . .All structures are designed to be as small as possible by code").

First, that the corner location, in front of the church, was rejected as the site for the elevator, as plaintiffs point out, *Plaintiffs' Memorandum* at 15-16, in fact shows that the visual impact on the historic building <u>was</u> "taken into account." Second, contrary to plaintiffs' other principal argument, *Plaintiffs' Memorandum* at 12-13, 16, the fact that the FTA considered planned measures to minimize the visual impact of the new entrance is not inconsistent with a finding of no adverse effect. Again, plaintiffs disregard the express language of the Section 106 regulations. The 106 consultation process the FTA followed was that applicable to a project which "might affect" an historic resource; the FTA did not conclude the project had <u>no</u> potential to cause effects on the historic property. 36 C.F.R. § 800.3(a)(1). <u>See</u> <u>Aersten</u>, 488 F.Supp. at 318 (agency may conclude a project will have no effect; that it will have an effect, but not one that is adverse; or that it will have an adverse effect). It is contrary to the entire scheme of Section 106 to suggest, as plaintiffs do, that any effect is an adverse one, <u>see</u> §800.4(c), or to argue, as is implicit in plaintiffs' brief, that any mitigating design measures proposed during the course of a project's development phase cannot be considered by the federal agency to have avoided an adverse effect.

Indeed, the opposite is true: the Section 106 regulations contemplate that an agency may propose a finding of no adverse effect <u>upon taking into consideration</u> conditions or modifications in the project to avoid adverse effects. 36 C.F.R. §800.5(b). Moreover, the regulations require that an agency's documentation of a finding of no adverse effect include, *inter alia*, "[a]n explanation of why the criteria of adverse effects were found applicable or inapplicable, including any conditions or future actions to avoid, minimize or mitigate adverse effects." 36 C.F.R. §800.11(d)(5). The discussions that took place during the design process about the most

27

appropriate design for the site, taking into consideration the adjacent historic resources, and

involving, among others, the BLC, the Church, and the MHC, AR265-66, 276-78, are exactly

what the statute and regulations are designed to encourage.  See, e.g., Narragansett Indian Tribe

v. Warwick Sewer Authority, 334 F.3d 161, 169 (1st Cir. 2003) (holding that where agency

sought expert advice, adopted recommendations from the SHPO and the expert, and treated even

belated objections from plaintiffs seriously, it had fulfilled its obligations under §106, complying

with both the letter and spirit of the law); Aersten at 319 (finding agency's no adverse effect

determination was not arbitrary or capricious where, inter alia, "measures [had been] taken to

make the project 'compatible with the existing environs'").

Finally, plaintiffs ignore that the ultimate conclusion rests with the agency, even where

the SHPO does not concur in the agency's findings.  See Coalition Against a Raised

Expressway, Inc. v. Dole, No. 84-1219-C, 1986 WL 25480 (S.D.Ala. Oct.20, 1986) (holding that

the agency complied with Section 106 when its responses to ACHP comments indicated that it

took the comments into consideration even though it ultimately disagreed with them), aff'd, 835

F.2d 803 (11th Cir.1988).  While plaintiffs obviously disagree with the FTA's ultimate

determination, they offer no evidence demonstrating that the agency neither consulted as

required, nor weighed the relevant factors.  Rather, plaintiffs simply argue, in essence, that since

the FTA approved the Parish House site for the elevator kiosk, it could not have taken a "hard

look" at alternative locations.   The record belies this assertion.  E.g., AR124-161, 265-66, 268-

74, 677-701.  Where the record shows that the FTA followed the required procedures, that from

the beginning of the project it took the concerns of historical preservation into account, and that

the SHPO concurred, the FTA fully complied with Section 106, and its determination must be

upheld.  See Brehmer v. Planning Bd. of Town of Wellfleet, 238 F.3d 117, 122 (1st Cir. 2001).

CONCLUSION

The Court should reject plaintiffs' attempt to block this long-overdue and important

project.  The FTA's finding of no adverse impact under Sections 106 and 4(f) is reasoned, based

on thorough review of the relevant considerations and information, and fully supported by the

record.  Plaintiffs' motion should be denied and the Court should enter judgment for the FTA.

Respectfully submitted,

By its attorney,

MICHAEL J. SULLIVAN
United States Attorney

Dated:   29 March 2005                     By: /s/ Barbara Healy Smith
                                           Barbara Healy Smith
                                           Assistant U.S. Attorney
                                           John Joseph Moakley U.S. Courthouse
                                           1 Courthouse Way, Suite 9200
                                           Boston, MA 02210
Of Counsel:                                (617) 748-3263

Joseph A. Pixley
Federal Transit Administration
U.S. Department of Transportation
400 7th Street, SW Suite 9316
Washington, D.C. 20590-0001

+-----------------------------------------------------+
| **CERTIFICATE OF SERVICE**                          |
|                                                     |
| I certify that on March 29, 2005, I caused a copy of|
| the foregoing to be served upon counsel of record   |
| for the parties                                     |
|                                                     |
|   /s/ Barbara Healy Smith                           |
| Barbara Healy Smith                                 |
| Assistant U.S. Attorney                             |
+-----------------------------------------------------+