UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC Plaintiff | ) ) ) ) | CIVIL ACTION NO. 04cv11550-RCL |
|  | ) ) |  |
| FEDERAL TRANSIT ADMINISTRATION and MASSACHUSETTS BAY TRANSPORTATION AUTHORITY Defendants | ) ) ) ) ) ) |  |

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs in this case, a neighborhood association and three of its members, challenge a

decision by the Federal Transit Administration ("FTA") approving the selection by the

Massachusetts Bay Transportation Authority ("MBTA") of the location for an elevator "head

house" that will provide access to the Arlington Street subway station on the MBTA's Green

Line for people in wheelchairs and others unable to use the existing entrances to the station.

Like many mass transit facilities in Boston, the Arlington Street station is located in an area of

significant historical interest.  Plaintiffs assert that FTA's approval of the location selected by the

MBTA – on the sidewalk on the north side of Boylston Street, adjacent to the parish house at the

rear of the Arlington Street Church – violated the National Historic Preservation Act and the

Department of Transportation Act.  Plaintiffs also assert, in a pendent state claim, that the

MBTA's selection of the location violated the Massachusetts statute that requires the integration of historic concerns into public decision making.

Plaintiffs have moved for summary judgment on their claims. The MBTA opposes plaintiffs' motion and cross moves for summary judgment on all of plaintiffs' claims. FTA has filed the Administrative Record ("AR"), which supports the decision being challenged under the two federal statutes. With respect to the challenge under Massachusetts law, the MBTA relies both on the record and on an affidavit from the architect principally responsible for the process of designing and siting the accessibility improvements to the Arlington Street station.

## LEGAL FRAMEWORK

Plaintiffs' claims arise in a complex legal setting. The Federal Transit Administration's brief analyzes in detail the federal statutes and regulations that apply in this case. We will not repeat that analysis here but offer a brief description of the legal framework to aid in understanding the MBTA's argument.

I.    The National Historic Preservation Act

The National Historic Preservation Act, 16 U.S.C. §§ 461-470x-6, requires that before undertaking or providing funding for a project, a federal official shall "take into account the effect of the undertaking on any" historic site and shall "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470(f) ("Section 106"). Regulations promulgated pursuant to Section 106 require the federal official to "involve the consulting parties . . . in findings and determinations made during the section 106 process." 36 C.F.R. § 800.2(a)(4). The "consulting parties" include the State Historic Preservation Officer, representatives of local government and applicants for federal assistance, among others. 36 CF.R. § 800.2(c). The federal official must also provide information to and solicit the views of members of the public. 36 CF.R.§ 800.2(d).

The regulations also provide a definition of an "effect" – the statutory predicate for the federal official's obligations.  "*Effect* means alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register."  36 CF.R.§ 800.16(i) (emphasis added).

Thus, a federal official must consult with a number of different parties on the issue of whether a proposed action will affect – that is, alter the historic characteristics of – a historic site – and, if the project will have such an effect, take that fact into account before proceeding with the project.

II.    Section 4(f)

The Department of Transportation Act, 49 U.S.C. et seq., provides that the Secretary of Transportation may approve a transportation project "requiring the use of . . . an historic site . . . only if (1) there is no prudent and feasible alternative to using that land; and (2) the . . . project includes all possible planning to minimize harm to the . . . historic site resulting from the use." 49 U.S.C. § 303(c) ("Section 4(f)").

Regulations promulgated pursuant to Section 4(f) define "use" as the permanent incorporation of the protected land into a transportation facility or the temporary occupancy of such land "that is adverse in terms of the statute's preservationist purposes".  23 C.F.R. § 771.135(p)(1)(i) and (ii).  The regulations also provide that even in the absence of actual occupancy of the protected land, there may be a "constructive use" in certain circumstances. Those circumstances are very limited, however.  Constructive use occurs when "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired.  Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished."  23 C.F.R. § 771.135(p)(2).

Thus, Section 4(f): (1) precludes the permanent physical occupancy of a historic site, unless there is no prudent and feasible alternative to that occupancy and all planning has been done to minimize the impacts of that occupancy; (2) does not preclude the temporary physical occupancy of a historic site, unless that temporary occupancy has an adverse affect on the historic qualities of the site; and (3) does not preclude a project that does not involve physical occupancy of a historic site, unless that project will substantially diminish the protected features or attributes of the historic site.[1]

III.   <u>Massachusetts Historical Review</u>

Massachusetts General Laws Chapter 9, Section 27C provides that:

> As early as possible in the planning process of a project undertaken by a state body . . . the state body undertaking . . . such project shall notify the [Massachusetts Historical] commission of such project and the commission shall, within thirty days of receipt of such notice, determine whether such project will have any adverse effect, direct or indirect, on any property listed in the state register of historic places. If the commission does not make a determination within thirty days, the state body . . . may proceed with the project. Upon a determination of adverse effect, the commission [and] the state agency . . . shall immediately consult to discuss ways to eliminate, minimize or mitigate the adverse effects . . ..

Thus under Massachusetts law (1) a state agency must provide notice to the Massachusetts Historical Commission ("MHC") of a proposed project, and (2) if MHC determines within 30 days that the project will have an adverse effect on a historic property, the agency and MHC must discuss ways to eliminate, minimize or lessen those effects, but (3) if MHC does not make an "adverse effect" determination within 30 days, there is no further obligation on the state agency, which is free to proceed with the project.

---

[1] A temporary occupancy that would adversely affect the historic qualities of a site or a nearby project that would substantially diminish the protected features of a historic site may still proceed if they can meet the "no prudent and feasible alternative" and "all planning to minimize harm" standards.

# FACTS[2]

Acting in response to the requirements of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq., the MBTA submitted a "Key Station Plan" to FTA, indicating which of its transit stations would be made handicapped accessible. (AR1-AR101). The MBTA designated Arlington Street subway station in Boston as one of the key stations. (AR29). In order to make the station accessible, there needs to be an elevator that can be used by people in wheelchairs; and, therefore, there needs to be an elevator "head house" at ground level, for use by passengers wishing to reach the underground trains. After preliminary analysis by another firm, the MBTA retained Leers Weinzapfel Associates Architects, Inc. ("LWAA") to work on the design and placement of the accessibility improvements, including analyzing possible additional sites for the elevator head house. (Stopps Affidavit p.1-2; AR126).

On July 15, 1997, the MBTA held a community meeting to discuss the location of the head house. (AR126). At that time, each of the four corners of the intersection of Arlington and Boylston Streets was being considered. (Those corners are northeast, adjacent to the Boston Public Garden, southeast, adjacent to a building called Heritage on the Common, southwest, adjacent to the Shreve, Crump and Low building, and northwest, adjacent to the Arlington Street Church.) (AR126). For different reasons, each of the corners was deemed unacceptable: Both of the eastern corners were unacceptable because the large majority of the pedestrian traffic using the station comes from the west; making the majority of people, especially people using wheelchairs, cross Arlington Street was inconsistent with the accessibility-enhancing purpose of the project. (AR126, 159-160). In addition, the northeast corner was unacceptable because of its

---

[2] These facts are drawn from two sources: The Administrative Record filed by defendant FTA and the Affidavit of Winnifred Stopps, filed with defendant MBTA's Cross Motion for Summary Judgment. The MBTA relies on the facts in the Administrative Record with respect to plaintiffs' federal claims. With respect to the pendent state claim, the MBTA relies both on the record and on the Stopps affidavit.

proximity to the Public Garden. (AR126). The southwest corner was unacceptable because of the narrowness of the sidewalks there and the volume of pedestrian traffic, which would have made wheelchair accessibility more difficult, thereby undercutting the purpose of the project. (AR126, 379). The northwest corner was unacceptable because placing the head house there would have interfered with the historic view of the front of the Arlington Street Church. (AR126, 379). In addition, all of the abutters (the Boston Parks Department on the northeast corner, the building owner on the southeast and southwest corners and the Arlington Street Church on the northwest corner) objected to placement of the head house on their corners. (AR126).

The MBTA therefore decided to consider "mid-block" locations for the head house and charged LWAA with reviewing locations to the west of the intersection, the direction from which most of the passengers come. (AR126). LWAA determined that the mid-block locations on either side of Boylston Street do not work. (AR124-141). A "quarter-block" location (part way between the corner of Arlington and Boylston and the middle of the block) on the north side of Boylston, however, does work. (AR124-141). It is in the direction from which the majority of the passengers come, the sidewalk is broad and it avoids the four corners of Arlington and Boylston. (AR124-141). (LWAA determined that the quarter block location on the south side of Boylston does not work, because of the difficulty of the engineering and the narrowness of the sidewalk.) (Stopps Affidavit, p. 5). LWAA therefore focused on a north side, quarter-block site, approximately 120 feet from the corner, adjacent to the parish house that is at the rear of the Arlington Street Church. (AR124-141; Stopps Affidavit, p. 5).

LWAA prepared the November 21, 1997 Additional Site Analysis Report to describe the foregoing analysis. (AR124-141). This report included a description of the original four corner

sites as baseline data, but those sites were no longer being considered because of the shortcomings described above. (AR126). In addition, as the November, 21 1997 report discloses, the Shreve, Crump and Low building on the southwest corner of Arlington and Boylston is potentially eligible for listing on the National Register of Historic Places and is therefore entitled to the same level of protection in the federal decision-making process as the properties on the northeast and northwest corners (the Public Garden and the Arlington Street Church).[3] (AR134, 138).

LWAA presented the results of its analysis at an April 16, 1998 meeting. (Stopps Affidavit, p.7). A number of community representatives attended this meeting, including from the Neighborhood Association of the Back Bay, the lead plaintiff in this case, and the Arlington Street Church. (Stopps Affidavit, p.7). All of the siting options were discussed at this meeting, but the focus was on the quarter block, parish house option, which the MBTA indicated it had determined was the preferred alternative. (Stopps Affidavit, p. 7). No objections to this option were raised at the meeting. (Stopps Affidavit, p.7).

After this meeting, FTA became involved in the process of selecting a site for the elevator head house. On April 4, 2001, representatives of FTA, the Massachusetts Historic Commission ("MHC"), and the Boston Landmarks Commission ("BLC") met at the Arlington Street station with the MBTA and LWAA. (AR388). LWAA described what had occurred to that point in the analysis of potential sites. (Stopps Affidavit, p.8-10). In particular, LWAA discussed the background of each site, along with its benefits and drawbacks, the latter including the smaller percentage of users coming from the east side of Arlington Street and the narrowness of the curb on the southwest corner. (Stopps Affidavit, p.8-10). The group walked to each

---

[3] In addition, the Shreve, Crump and Low building is in the Back Bay Historic District, a fact that also entitles it to protection in the federal process. See text accompanying note 6, *infra*.

location, observing the historically significant buildings on the northwest and southwest corners and the Boston Public Garden on the northeast corner.  (Stopps Affidavit p.8-10).

During the April 4, 2001 meeting, the group discussed the viability of a location at the southwest corner of Arlington and Boylston streets, in front of the Shreve, Crump & Low building. ( Stopps Affidavit p.8-9).  The group noted that a special elevator would be necessary because of the narrow sidewalk at that corner.  (Stopps Affidavit, p.9).  A representative of FTA expressed concern about the narrowness of the sidewalk.  (Stopps Affidavit p.9).  During the April 4, 2001 site visit, LWAA presented information on large boards.  (For scaled versions of many of the boards, see AR124-161).  The boards show that the Shreve, Crump and Low building is a Category 3 landmark, which is potentially eligible for listing as a National Historic Landmark. (See AR124-161).

On October 23, 2001, FTA convened a "Section 106 consultation" to review the potential historic impacts of the quarter block, parish house location.  (AR267-269).  Representatives of the Massachusetts Historical Commission and the Boston Landmarks Commission attended, along with members of the public, which had been notified of the consultation session.  (AR 275-280).

On or about December 9, 2002, FTA determined that the proposed quarter block, parish house location would not have an adverse effect on any historic property. (AR369).  On January 31, 2003, the Massachusetts Historical Commission indicated its agreement with this determination.  (AR460).

## **ARGUMENT**

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there are no

genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); See Grubb v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996). The moving party may discharge its initial burden of "'showing' the absence of a genuine issue concerning any material fact by pointing out to the district court that 'there is an absence of evidence to support the nonmoving party's case.'" Flanders & Medeiros, Inc. v. Bogasian, 65 F.3d 198, 206 (1st Cir. 1995) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), cert. denied, 484 U.S. 1066) (1988)). When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. Celotex, 477 U.S. at 324. As to the issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. Id. Central to the purpose of the rule is to "make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved." Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976).

II.    STANDARD OF REVIEW FOR THE FEDERAL CLAIMS

Under the Administrative Procedure Act, 5 U.S.C. § 706, "a court's review of a challenge to an administrative decision is limited to scrutiny of the record for the existence of errors of law or absence of reasoned consideration of the record to support the factual conclusions reached by the agency." The appropriate standard for judicial review of an administrative agency's action is whether the agency decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See generally, Camp v. Pitts, 411 U.S. 138 (1973). A court's review of whether an agency's decision was arbitrary and capricious "must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.'" Marsh v. Oregon Natural Resources, 490 U.S. 360, 378 (1989).

Where the review of an agency decision involves an interpretation of law, an agency's interpretation of its own rules must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Udall v. Tallman, 380 U.S. 1, 16 (1965). The agency's interpretation of its rules "need only be reasonable, and not the only interpretation or the one the court would have reached if it was initially faced with the question." Enron Oil & Gas Co. v. Lujan, 978 F.2d 212, 215 (5th Cir. 1992). A reviewing court may not substitute its own judgment for that of the agency. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 555 (1978) rev'd on other grounds by Balt. Gas.& Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87 (1983).

## III.    STANDARD OF REVIEW FOR THE STATE CLAIM

The pendent state claim here is an action in the nature of *certiorari* under M.G.L. C. 249, § 4 challenging the discretionary decision of a state official. Courts are to apply the arbitrary and capricious standard in reviewing such discretionary decisions. "Certiorari review of such discretionary action is generally not available except to determine whether the action was arbitrary and capricious." Chandler v. County Comm'r of Nantucket County., 437 Mass. 430, 434 (2002); Northboro Inn, LLC v. Treatment Plant Bd. of Westborough, 58 Mass. App. Ct. 670, 673-74 (2003).

## IV.    FTA ACTED LAWFULLY IN APPROVING THE LOCATION OF THE ELEVATOR HEAD HOUSE.

### A.    FTA Complied with the National Historic Preservation Act.

The National Historic Preservation Act, ("NHPA") requires that a federal official determine whether a proposed action will affect historically significant places. 16 U.S.C. § 470(f) ("Section 106"). That determination is to be made after consultation with a number of parties specified in regulations adopted pursuant to the NHPA. See 36 C.F.R. § 800.2.

In this case, the Regional Administrator of FTA consulted – extensively – with the parties specified in the regulations, most notably the State Historic Preservation Officer ("SHPO"). (AR385-388).  The SHPO for Massachusetts is the Massachusetts Historical Commission ("MHC").  FTA's consultation process also included the City of Boston agency charged with historic preservation (the Boston Landmarks Commission), and members of the public, including members of plaintiff Neighborhood Association of the Back Bay, in the consultation process. (AR267-280).

Following this consultation process, FTA determined that placing a redesigned elevator head house on the sidewalk of a major 21st century commercial thoroughfare toward the rear of the historic Arlington Street Church would not adversely affect the historic qualities of the church or of the Back Bay Historic District in which the church – as well as all of the other potential sites for the head house that would accomplish the goal of making the Arlington Street station accessible to the majority of its handicapped patrons – is located. (AR369).

Plaintiffs attack FTA's conclusion as "a ritualistic recitation of magic words that lead it through a merely procedural framework."  Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memo") p. 15.  But FTA did not simply go through the motions.  It consulted, as it was obliged to do, and it looked hard at the potential effects of the proposed action.[4]

---

[4] In support of their assertion that FTA simply undertook a mechanical process, plaintiffs cite *Save Our Heritage v. FAA*, 269 F.3d 49, 58 (2001) for the proposition that the act "imposes 'a substantive obligation in deciding whether to authorize the federal action["].  See Plaintiffs' Memo p. 15.  The intended implication – that the statute compels a particular result – is misleading.  *Save Our Heritage* holds that there is "a substantive obligation to weigh effects in deciding whether to authorize the federal action . . .." 269 F.3d 49, 58 (emphasis added).  The record is clear that FTA weighed the effects of the action in issue here.

B.      The Consultation Process and FTA's Consideration of Effects

The regulations describe the review process in detail. See C.F.R. §§800.1-800.16 (2005).

The agency must first determine whether the federal action will potentially affect historic

properties.  36 C.F.R. §800.3(a).  If that determination is made, and the proposed action is

subject to the NHPA review process, the agency must identify the appropriate SHPO, in this case

MHC, and consult with that officer regarding the undertaking and its effects on historic

properties. 36 C.F.R. §800.3(c).  FTA and the MBTA involved MHC early in the Arlington

Station Project process.  (AR387).  Later in the process, FTA held a Section 106 review and

consultation meeting that included MHC as well as community representatives and the Boston

Landmarks Commission.  (AR268-280).

FTA corresponded with MHC regarding the undertaking and its effects.  (AR369).  After

determining that the project would not have an adverse effect, FTA submitted a finding of no

adverse effect together with the supporting documentation to MHC.  See 36 C.F.R. §800.5(b).

The regulations provide MHC thirty days to review the determination, see 36 C.F.R.

§800.5(c)(1) and §800.4(d)(1), and permit FTA to proceed if MHC agrees with the

determination.  Id.  MHC concurred with the determination made by FTA: the proposed project

would have no "adverse effect" on the Back Bay Historic District, an area that includes the

Arlington Street Church.[5]  (AR460).

C.      FTA's Care With Respect to the Project Does Not Invalidate Its Decision.

Plaintiffs argue that defendants' efforts to ensure that the head house structure will be as

unobtrusive as possible necessarily mean that the project will have an "adverse effect" that

---

[5] The Back Bay Historic District is "roughly bounded by the Charles River, Arlington, Providence, Boylston and Newbury Streets and Charlesgate East."  See National Register of Historic Places available at http://www.nr.nps.gov/ (search Boston, MA) or http://nationalregisterofhistoricplaces.com/MA/Suffolk/districts.html (March 28, 2005).

requires further consultation with respect to resolution of those effects. Plaintiffs' Memo 15-17. This is incorrect both as a matter of law and with respect to sensible agency practice. As a legal matter, FTA determined that the project would not have an adverse effect on the church or the historic district. (AR369). The elevator head house will be on the sidewalk on Boylston Street, a busy modern thoroughfare that is often crowded with traffic. It was reasonable for FTA to determine that in this circumstance (as opposed to, say, that of a colonial battlefield set in the woods), the addition of the head house would not produce an adverse affect on the church or the district.

It is plaintiffs whose reading of the statutory requirement is wooden. By mechanically equating "nearby" or "visible in the same view as" or even "partially obstructing the view of" (a characterization whose implication – that a passerby's view of the church will be measurably affected – is not supported by the record) with the proscribed "introduction of visual . . . elements that diminish the integrity of the property's significant historical features", 33 C.F.R. § 800.5(a)(2)(v), see Plaintiffs' Memo 15, the plaintiffs essentially read the consultation process out of the statute. Neither the statute nor the regulations suggests such a categorical result. Instead, they contemplate that FTA will consult with others to determine whether a particular action will "diminish the integrity of the property's significant historical features." See generally 16. U.S.C. §470(f); 36 C.F.R. §§800.1-800.26. That is what FTA did, consult with others, including plaintiffs. (AR268, 275-280, 385-388). And the unanimous view in those consultation sessions was that the proposed action would not "diminish the integrity" of the historical features of the Arlington Street Church or the Back Bay Historical District – and therefore that it would not have an "adverse effect" on the church or the district.

As a matter of agency practice, as well, it makes no sense to adopt plaintiffs' reading of the statute. If an agency's well-supported conclusion that a project will not have a regulatorily-defined "adverse effect" can be undone in litigation by showing that the agency nevertheless took steps to assure that the project is as unobtrusive and in keeping with its surroundings as possible, then agencies will not take those steps – and the overall purpose of the statute will be undermined.

V.      FTA Complied with Section 4(f).

Plaintiffs assert that FTA's approval of the proposed location for the Arlington Street station elevator head house violated the Department of Transportation Act, 49 U.S.C. et seq. Section 4(f) of the act places limits on using parkland or historic properties for transportation projects. Plaintiffs argue that FTA's action is unlawful for two reasons: First, the head house is in the Back Bay Historic District. Second, "it is proposed to be built, in part, on land of the Arlington Street Church . . .." Plaintiffs' Memo 20. Plaintiffs are incorrect on both counts.

A.      The Back Bay Historic District

Plaintiffs' assertion that the accessibility improvements for the Arlington Street station cannot be built in the Back Bay Historic District is wrong, for two reasons. First, Section 4(f) does not apply to the district. By its terms, Section 4(f) forbids (except in certain circumstances) "the use of . . . a public park, recreation area, or wildlife and waterfowl refuge . . . or land of an historic site . . .." The Back Bay Historic District is none of these. It is not a park, a recreation area or a refuge. And "site", as it is used in the statute, plainly connotes the specific location of a building or other structure of historic significance.

Any other reading would mean that Section 4(f) precludes, throughout large stretches of the City of Boston, any transportation improvements involving federal assistance. The Back Bay Historic District is "roughly bounded" by the Charles River, Arlington, Providence, Boylston

and Newbury Streets and Charlesgate East.[6]  It is simply not reasonable to read the Section 4(f)'s

prohibition on use of a "site" to forbid locating a bench for bus passengers, a kiosk with

transportation information – or an elevator head house permitting handicapped people to reach

the subway – anywhere in this area.

     Second, if Section 4(f) did apply to the entire historic district (which means, as is pointed

out in note 6, that it would also apply to the to the southwest corner of the intersection of

Arlington and Boylston Streets, where plaintiffs insist the elevator head house should be built),

then the "escape hatch" that the statute provides would clearly be available.  Section 4(f) does

not forbid the use of an historic site if "(1) there is no prudent and feasible alternative to using

that land; and (2) the . . . project includes all possible planning to minimize harm to the . . .

historic site resulting from the use."

     The Arlington Street station is in the Back Bay Historic District.  The majority of the

passengers who use the station come from within the historic district.[7]  (AR159-160)  Pursuant to

the Americans With Disabilities Act, the MBTA is required to make the station accessible to

people who are unable to use it as it now exists.  There is thus "no prudent and feasible

alternative" to placing an elevator head house within the Back Bay Historic District.

     With respect to the second requirement for relief from the strictures of Section 4(f), the

record is clear that FTA did all possible planning to minimize harm.  The design for the head

house was reviewed by the Massachusetts Historical Commission and the Boston Landmarks

Commission. (AR276-280, 369, 385-388, 460).  As the result of this review, the structure was

---

[6]  The historic district thus includes the southwest corner of Arlington and Boylston Streets, the location at which
plaintiffs suggest the head house should be built.  See National Register of Historic Places available at
http://www.nr.nps.gov/ (search Boston, MA) or
http://nationalregisterofhistoricplaces.com/MA/Suffolk/districts.html (March 28, 2005).

[7]  Plaintiffs devote a page of their brief to disputing defendants' analysis of pedestrian traffic patterns.  See Plaintiffs'
Memo 9-10.  Judgments of this kind are within the expertise of both the MBTA and FTA and should not normally
be disturbed by the court.

made smaller, and the materials to be used were changed, so that it would be more in keeping with its surroundings. (AR275-282, 367-368, 382-383). Even if the Section 4(f) requirements did apply to the entire historic district, FTA acted lawfully in approving the location of the elevator head house.

      B.    <u>Arlington Street Church</u>

Plaintiffs also argue that the accessibility improvements will be built "on land of the Arlington Street Church." Plaintiffs' Brief 20. That is incorrect. The project will use Arlington Street Church property in two ways. First, temporary easements will be taken that are necessary during construction. (AR380). Following construction, the area where the temporary easements were will be entirely restored. (AR380). Second, there will be certain permanent **subsurface** easements to permit access to parts of the completed improvements. (AR380).

The regulations promulgated pursuant to Section 4(f) distinguish between "permanent[] incorporat[ion] into a transportation facility" and "a temporary occupancy of land" The first is a "use" which is prohibited by the statute (except in limited circumstances). The second is not a use, and is therefore not prohibited, unless the "temporary occupancy . . . is adverse to the statute's preservationist purposes." 23 C.F.R. § 771.135(p)(i) and (ii). The temporary occupancy is not "adverse" to the statutory purposes if (1) it is temporary, (2) the work is minor, (3) there are no anticipated permanent physical impacts and no interference with the activities or purposes or the resource, (4) the land will be restored and (5) there is documented agreement with relevant governmental authorities. 23 C.F.R. at § 771.135(p)(7). These criteria are all met here. (AR372-389). The FTA's determination to permit the temporary occupancy of land of the Arlington Street Church for purposes of constructing accessibility improvements to the Arlington Street station was lawful under the Department of Transportation Act.

Because of the vagueness of the assertion, it is unclear whether plaintiffs mean to suggest that, because the MBTA will hold subsurface easements under the property of the Arlington Street Church, the project will be "built" on the church's property.  If they do intend to make that argument, it is based on an untenable reading of the statute.  The clear purpose of the prohibition against "use" of particular kinds of properties is to protect the virtues that made them what they are – parks, refuges, historic sites.  The virtues that make the Arlington Street Church what it is are essentially visual: we can look at it and see an important example of mid-19[th] century New England church architecture.  The existence of subsurface easements of which no one will be aware is simply not a "use" of the church that is prohibited by the statute.

This conclusion is buttressed by a consideration of the regulation that **does** apply in this case.  The 4(f) regulations recognize that in certain situations where there is not physical incorporation or occupancy of protected land, there may nevertheless be a "constructive use" that is covered by the statute.  Such a constructive use occurs when a project is near a protected site and interferes with the protected qualities of the site.  That is what the plaintiffs are complaining about.  But as a legal matter, that occurs only in very limited circumstances:  "Constructive use occurs when . . . the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired.  Substantial impairment occurs only when the protected activities, features or attributes of the resource are substantially diminished."  23 C.F.R. § 771.135(p)(2).

Plaintiffs have not even attempted to meet the burden established by this regulation.  But it is the problem that this regulation seeks to address – "proximity impacts" – that is at the heart of the plaintiffs' case.  Because they can not show that the project will "substantially diminish" the historic values of the Arlington Street Church, plaintiffs can not succeed on their 4(f) claim.

VI.    THE MBTA COMPLIED WITH M.G.L. CHAPTER 9, SECTION 27C.

Plaintiffs argue that the MBTA has not complied with the Massachusetts Historic Preservation Act because the MHC's determination that placement of the Arlington Street station elevator head house at its proposed location would have no adverse effect on the Back Bay Historic District was "provisional". Plaintiffs' Memo 21. This is incorrect factually, but if it were correct, then the plaintiffs would have to lose this challenge on legal grounds.

Like its federal counterpart, the Massachusetts statute seeks to minimize impacts to historically significant sites by establishing a process for consideration of whether state projects will have an "adverse effect" on properties listed on the state register of historic places. M.G.L. c. 9, § 27C. The Arlington Street Church is listed on the state register. The statute provides that "[a]s early as possible in the planning process of a project undertaken by a state body . . . the state body . . . shall notify the [Massachusetts Historical] commission of such project and the commission shall, within thirty days of receipt of such notice, determine whether such project will have any adverse effect . . . on any property listed on the state register of historic places. If the commission does not make a determination within thirty days, the state body . . . may proceed with the project." M.G.L. c. 9, § 27C.

Pursuant to this requirement, the MBTA notified MHC of its intention to construct the head house on the sidewalk on the north side of Boylston Street adjacent to the Parish House of the Arlington Street Church. (AR265-266, 387-389). Subsequent to the process that is described earlier in this brief, MHC concluded that the MBTA's project would not have such an "adverse effect". (AR265-266, 460).

Plaintiffs focus on the following language in the letter embodying MHC's conclusion: "I concur with the FTA's determination that the proposed project will have 'no adverse effect' on the Back Bay Historical District . . . provided that the MBTA and the Church submit more

detailed plans of the accessibility modifications to the Arlington Street Church for MHC review when they become available." (AR460).  This, they say, means that MHC has not made a final "no adverse effect" determination.

That is not correct.  The context makes it clear that, with respect to the MBTA's project, MHC has made a final determination. (AR460).  In conjunction with the MBTA's Arlington Street station accessibility project, the Arlington Street Church plans to undertake improvements of its own to make the church accessible to people with handicaps. Brief Amicus Curiae of Arlington Street Church, p.3.  MHC has the authority to review those improvements to determine whether they have an "adverse effect" on a historic property.  The proviso in the letter is simply an assertion, perhaps inartfully stated, that MHC still intends to assert that authority. (AR460).  But no matter what the result of MHC's review of the church's project, there will be no basis on which to change its conclusion with respect to the MBTA's project – that it will not have an adverse effect on the historical district.

This conclusion is supported by the structure of the statute, with which the court can presume MHC is familiar:  If MHC does not make a determination regarding the adverse effect of a project within 30 days of having been notified of the project, the project proponent "may proceed with the project."  M.G.L. c. 9, § 27C.  Thus, if plaintiffs were correct that the MHC has not yet made a determination with respect to the Arlington Street station accessibility improvements, there is no longer jurisdiction under the statute, and the MBTA may proceed with the improvements.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## **CONCLUSION**

For all of the foregoing reasons, defendant Massachusetts Bay Transportation Authority asks that the court deny plaintiffs' motion for summary judgment and grant the MBTA's motion for summary judgment and dismiss all counts of plaintiffs' complaint and enter judgment for the MBTA.

Respectfully submitted,

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY**

By its attorneys,


_____ /s/Stephen M. Leonard
Stephen M. Leonard (BBO #294080)
Amanda Buck Varella (BBO #641736)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
(617) 856-8200
Dated: March 29, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Gerald Fabiano
Pierce, Davis, Fahey & Perritano, LLP
Ten Winthrop Square
Fifth Floor
Boston, MA 02110

Herbert P. Gleason
Law Office of Herbert P. Gleason
50 Congress Street, Room 300
Boston, MA 02109

Barbara Smith Healy
United States Attorney's Office
John Joseph Moakley Federal Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

       /s/ Stephen M. Leonard
Stephen M. Leonard

Dated:  March 29, 2005

# 1353840 v2 - RYANJM - 020445/0007