UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC. et al. | ) ) ) ) | CIVIL ACTION NO. 04cv11550-RCL |
| Plaintiffs | ) ) | SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' |
| v. | ) ) | MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION |
| FEDERAL TRANSIT ADMINISTRATION et al. | ) ) | TO DEFENDANTS' CROSS- MOTIONS |
| Defendants | ) ) | |

Defendant Massachusetts Bay Transportation Authority ("MBTA") proposes to add an elevator entrance and stairway on the sidewalk or Boylston Street in Boston adjacent to the Arlington Street Church. Not only is the Arlington Street Church on the National Register of Historic Places, but the proposed location is also in the Back Bay Historic District, which district is listed in the National Register of Historic Places. Defendant Federal Transit Administration ("FTA") is providing funding for this project. The FTA is an administration in the U.S. Department of Transportation. 49 U.S.C. §107.

The Department of Transportation Act of 1966, §4(f) allows approval of a transportation program or project requiring the use of land of a historic site[1] only if

(1) there is no prudent and feasible alternative to using that land; and
(2) the program or project includes all possible planning to minimize harm to the ... historic site resulting from the use.

49 U.S.C. §303.

---

[1] Historic sites under 42 U.S.C. §303 include sites on the National Register of Historic Places. 23 C.F.R. §771.135(e), made applicable to the FTA by 49 C.F.R. §622.101. See also Administrative Record ("AR") 748 (showing the FTA's application of 23 C.F.R. §771.135 to its review of historic interests under 49 U.S.C. §303).

The FTA determined that the requirements of 49 U.S.C. §303 do not apply to the MBTA's proposed project. AR 748. In deciding whether this FTA determination was arbitrary and capricious, the Court must consider not only the implausibility of the agency determination and the consideration of irrelevant factors, but also whether the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The Administrative Record contains the National Park Service documents showing the Arlington Street Church's inclusion and description for the National Register of Historic Places. AR 754-768. In contrast, the Administrative Record does not include such a description of the Back Bay Historic District, which district is on the National Register of Historic Places. Without considering such a Description of Bounds for the historic district, the FTA would not have been able to determine that the MBTA's project, now proposed to be constructed within the historic site of the district, could have been constructed outside this historic site.

The defendants may argue that the FTA's determination that the MBTA's proposed project "will not adversely affect the historic qualities of the Arlington Street Church within the Back Bay Historic District," AR 748, excuses the project from the requirements of 49 U.S.C. §303. The FTA's "Finding of No Significant Impact," however, has misstated the statutory requirements in 33 U.S.C. §303. AR748. This statute inquires not whether the proposed program or project adversely affects the historic site, but merely whether the project uses the historic site. 33 U.S.C. §303. The question of whether the program or project adversely affects the historic site arises only for temporary use of the historic site, 23 C.F.R. §771.135(p)(1)(ii), or for determining

2

whether a "constructive use" of the historic site exists. 23 C.F.R. §771.135(p)(5)(i). The MBTA's proposed project will be permanent structures in the Back Bay Historic District; it is neither a temporary use nor a constructive use.[2]

The MBTA proposed and the FTA approved a project in the historic site of the Back Bay Historic District, but the FTA did not make the necessary statutory determinations of the lack of a prudent and feasible alternative and the employment of all possible planning to minimize harm. These deficiencies alone violates the 49 U.S.C. §303. The Court cannot supply a reasoned basis for the FTA's determination that the FTA did not supply itself. *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43. If the defendants attempt to show (from the voluminous Administrative Record) that the FTA reached a reasoned conclusion on the statutory factors of lack of alternatives and employment of all possible planning to minimize harm, then the lack of the two attached documents in the Administrative Record are glaring deficiencies in the record basis for the FTA's decision. The FTA has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n, supra*.

First, the Description of Bounds of the Back Bay Historic District, as it is listed on the National Register of Historic Places, shows that the southeast corner of the intersection of Arlington Street and Boylston Street is outside the historic district.

---

[2] The defendants may still argue that the Back Bay Historic District is too large or varied to be protected by 49 U.S.C. §303. Not only is this inconsistent with the language of the statute and its regulations, but it is also inconsistent with importance of protection accorded large and varied historic districts. See *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 191 (1st Cir.1996)(historic preservation interest sufficient to defeat First Amendment challenge to complete ban of newspaper distribution boxes on Beacon Hill sidewalks, even on its most commercial street).

Second, the March 1995 MBTA Light Rail Accessibility Program Schematic Design Report shows an alternative location for an elevator entrance, in an existing stairwell, on the southeast corner of the Arlington-Boylston intersection. (The Administrative Record contains seven documents which pre-date this Schematic Design Report, AR 1-126, but does not contain this report.) The Administrative Record already shows the feasibility and prudence of an elevator entrance at this corner. AR 126-132. Placing the elevator entrance in an existing stairwell at the southeast corner, as shown in the Schematic Design Report, eliminates the problem of a sidewalk "bulb-out" at this corner raised at AR131.

The FTA did not make the determinations required under 49 U.S.C. §303. In addition, the Description of Bounds of the Back Bay Historic District, as listed in the National Register of Historic Places and the March 1995 Schematic Design Report show that the FTA did not even have the documents it needed to determine whether the MBTA's proposed project was permitted under 49 U.S.C. §303. The lack of these documents shows that the FTA and MBTA did not employ "all possible planning to minimize harm to the ... historic site," 49 U.S.C. §303.

The Plaintiffs

By their attorney

/s/ Gerald Fabiano

Gerald Fabiano  BBO No. 157130
Pierce, Davis & Perritano, LLP
10 Winthrop Square  5th Floor
Boston, MA 02110
617-350-0950

Certificate of Service

I hereby certify that a true copy of the above document was served upon all counsel of record, by mail and by e-mail, on June 30, 2005.

/s/ Gerald Fabiano
Gerald Fabiano

Case 1:04-cv-11550-JLT    Document 49    Filed 06/30/2005    Page 5 of 17

Form 10-300a    UNITED STATES DEPARTMENT OF THE INTERIOR
(July 1969)         NATIONAL PARK SERVICE

NATIONAL REGISTER OF HISTORIC PLACES

INVENTORY - NOMINATION FORM

(Continuation Sheet)

| STATE | Massachusetts |
|---|---|
| COUNTY | Suffolk |
| FOR NPS USE ONLY | |
| ENTRY NUMBER | DATE |

(Number all entries)

7—Description (Cont.)         Back Bay District            p. 3.
                    DESCRIPTION OF BOUNDS

The Back Bay District includes the property bounded and defined in the following manner:

Starting at the intersection of the midline of Arlington St. and the midline of Providence St.;

Thence running northerly by the midline of Arlington St. to the midline of Beacon St.;

Thence running westerly by the midline of Beacon St. to the midline of Embankment Road;

Thence running northerly along the midline of Embankment Road, crossing Storrow Drive, and extending to the southerly perimeter of the Hatch Shell grounds;

Thence running northeasterly along the perimeter of the Hatch Shell grounds to the rear perimeter of the Hatch Shell;

Thence running northwesterly along the rear perimeter of the Hatch Shell and extending to the southern shore of the Charles River Basin, (known at this point as the boat haven);

Thence running westerly along the northern perimeter of the Storrow Embankment, and intersecting with the extension of the midline of Charlesgate East;

Thence running southerly along said extension and the midline of Charlesgate East to the back lot lines of properties fronting on the south side of Newbury St;

Thence running easterly along said back lot lines to the midline of Massachusetts Ave.;

Thence running southerly along the midline of Massachusetts Ave. to the midline of Boylston St.

Thence running easterly along the midline of Boylston St. to the western lot line of no. 710 Boylston St., now called the Lenox Hotel;

Thence running southerly along the said western lot line to the southern lot line of no. 710 Boylston St.;

Thence running easterly along said southern lot line, extending to the midline of Exeter St.;

Thence running southerly along the midline of Exeter St. to a point at the juncture of the midlines of Exeter St., Stuart St., and Huntington Ave.;

Thence running easterly along the midline of Stuart St. to the midline of Trinity Pl.;

Thence running northerly along the midline of Trinity Pl. to the midline of St. James St.;

Thence running easterly along the midline of St. James St. to the midline of Clarendon St.;

Thence running northerly along the midline of Clarendon St. to the midline of Providence St.;

Thence running easterly along the midline of Providence St. to the midline of Arlington St., the point of beginning.

GPO 921-724

TOTAL P.02

Case 1:04-cv-11550-JLT    Document 49    Filed 06/30/2005    Page 7 of 17

## 6.3 Arlington Station

### 6.3.1 Existing Conditions, Constraints and Access Issues

Arlington Station, located at the intersection of Boylston and Arlington Streets, is a grade separated subway station which includes a mezzanine level between the street and platform levels. Separate inbound and outbound platforms share street level entrances and are accessed from the same fare collection mezzanine.



Figure 6-84: Arlington Street Church

### Urban Design Context

This station serves a very busy, high density, mixed-use downtown area with a distinct historical character. It supports an important gateway node that marks the beginning of the Back Bay Historic District and fronts onto Boston's showcase park, the Public Garden.

Three of the four corners at the intersection of Arlington and Boylston Streets are important locations from an architectural and urban design perspective, as they incorporate properties with significant historic or landmark status:

- The Arlington Street Church (1861, National Register of Historic Places, City of Boston Landmark)

- Boston Public Garden and the William Ellery Channing Monument (1859, National Register of Historic Places)

- The Shreve, Crump and Low Building (1912, included in the Back Bay Historic District boundaries)

The southeast corner is occupied by a recently completed mixed-use complex, the Heritage on the Garden Building, characterized by its contextual architectural design. In addition, the station itself is listed in the National Register.

The station is currently approached by pedestrians coming from all directions. Three stair entrances are located parallel to Arlington street: one at the Arlington Street Church corner, one next to the Shreve, Crump and Low Building, and the other across the street fronting the Heritage on the Garden Building. Another stair entry existed inside the Public Garden, but its use has been discontinued and the opening sealed off. In addition to these entrances, the station originally included a secondary

(part-time) connection to the Berkeley/Boylston Street intersection, west of the present station entrances. This alternative entrance has also been closed-off to the public and there are no plans to reopen it in the foreseeable future.

Access to and from the stair entries is by way of public sidewalks, signalized crosswalks and noncompliant diagonal curb ramps located at the corners of the Arlington/Boylston Street intersection. The public sidewalks in the vicinity of the station entrances are generous in width, except where the width of the sidewalks is reduced due to the location of the stair parapet walls or guardrails. (Especially next to the Shreve, Crump and Low Building). Most of the curb ramps (3 of the 4) do not meet accessibility slope minimum requirements (see Appendix 1 for Access Audit information). The curb ramp adjacent to the Heritage on the Garden Building is compliant with present ADA/MAAB requirements. The existing crosswalks are narrow, worn and not in all cases aligned with the curb ramps which they serve.

The main urban design objectives to be considered throughout the design of the project include:

- Respect the historical character of landmark properties adjacent to the station.

- Keep the busy corners open for pedestrian usage and minimize blockage of pedestrian flows in the proximity of the station entrances.

- Minimize visual blockages along important street view corridors.

In summary, any streetscape intervention resulting from access improvements to the station will need to address the special historical character and pedestrian circulation patterns of the Arlington/Boylston Street intersection area.



Figure 6-85: Boston Public Garden, Channing Statue

Figure 6-86: Heritage on the Garden Building

## 6 STATIONS

### Street Level

No accessible entrance exists to this station. Presently, the stair entrances are being refinished as part of a station-wide upgrading project. It is expected that this work will conform to MAAB requirements, however the station architects should verify the final profiles of stair treads and risers, railings, etc. for compliance with those requirements.

In addition to providing an accessible station entry at the street level, the MBTA's current policy is to enclose the presently open stairs, in order to minimize weather exposure and potential safety problems. Given the urban design issues discussed above, this may seem more a challenge than an opportunity. (See the PDM, Stairs.)

### Mezzanine Level

All of the existing station street entrances lead to the unpaid lobby of the mezzanine. The unused pedestrian tunnel from the former Public Garden entrance presently provides storage space for a flower vendor. Employee toilet facilities, not currently accessible, and various other support spaces (not requiring conformance to access requirements) are also located along the unpaid lobby.

The fare array system does not comply with present accessibility requirements with respect to the gate and fare collector's booth design parameters. (See Access Audits Forms.)

Beyond the fare array, the paid lobby leads to sets of stairs and escalators connecting the mezzanine to the separate platforms below. In addition, two exit turnstiles are provided for egress towards the street level stairs.



Figure 6-89: Stair entrance at Church

Figure 6-90: Stair entrances at Heritage

Figure 6-87: Boston Public Garden, Arlington Street

Figure 6-88: Entrance stair at Shrieve bldg.

Access to and from the escalators is through corridors at a higher floor elevation from the mezzanine floor, a small flight of stairs provides a transition between the two levels. The escalators are normally running in the exit direction all the time.

The stairs leading to each platform are being upgraded to MAAB standards, except the lower runs in contact with the platforms. These have open risers and railings not in compliance with the above standards.

Currently, there is no accessible vertical circulation connecting the mezzanine level with the two platforms below.

### Platform Level

The existing platforms are simple linear corridors, somewhat narrow (+/- 15'-3") and relatively level with a line of columns close to the edge of the platform. They are presently approached from the eastern ends of the platforms only. Normal egress from the trains is accommodated through the end of platform stairs and the mid-platform escalators leading to the mezzanine level. As previously mentioned, the stairs at the western end of the platforms (2 per platform) are currently closed.

Aside from providing an accessible route connecting the platform to the paid lobby of the mezzanine, the main access issue at the platform involves the boarding/exiting of the future Low Floor Vehicles (LFV's). Specifically, the existing platform levels are too low to permit operation of the LFV's deployable access ramps. Another key design problem is that the existing columns are so close to the platform edges and to each other that they form potential obstructions which will significantly limit the flexibility of deploying the LFV's car ramps along the platforms.

*Figure 6-91: Fare array system at mezzanine*

*Figure 6-92: Existing open stair at platform*

*Figure 6-94: Platform, general view*



Figure 6-95: Arlington Station, Street plan    Scale: 1"=40'

### 6.3.2 Proposed Accessibility Program and Designs

This section summarizes the scope of work required to make Arlington Station accessible. The scope items are discussed by station levels, except when dealing with vertical circulation elements, such as the elevators, where the issues related to the two levels connected by the elevators will be combined into one presentation. This section also defines other work elements that will either be triggered by the implementation of the accessibility project or have been requested by the MBTA, but not necessarily associated with a particular access requirement. Station wide program elements, not tied to a particular level, are presented at the end of this section. In addition, engineering systems upgrades (HVAC, Plumbing, Fire Protection and Electricity) for this particular station are given in Appendix 4.

### Street Level Program

At the street level, the main accessibility program requirements will be to provide an accessible route of travel (i.e. curb ramps and crosswalks) and an accessible entrance (i.e. elevator) to the station with the appropriate signage. Alternative locations for an accessible entrance and proposed accessible route are indicated in Figure 6-95.

The following summarizes the work elements required at Arlington Station street level:

**Curb Ramps/Crosswalks:** 3 of the 4 existing corners and 4 crosswalks at the Arlington/Boylston Street intersection will need to be reconstructed in accordance with the latest accessible route requirements.

The intersection also has many existing infrastructure elements (utilities, light poles, signage, etc.) that will need to be relocated in order to locate the recommended curb ramps and crosswalks.

The proposed street plan shows 3 corner curb cuts that, according to the current draft of MAAB, may not be allowed in the future. However, in order to avoid interference with the existing MBTA stairs, and because of the angled geometry of the curb in front of the Public Garden, these corner cub cuts seem to be necessary. The station architect and the MBTA may have to seek a variance from MAAB for these crossings.

Final design work at this corner should also be coordinated with the proposed *Boylston Street Improvements Master Plan*. This plan shows paved crosswalks and curb ramps, appropriate to such a prominent corner.

### Street To Mezzanine Level Elevator

**Options:** In order to provide an accessible entrance to the station at street level, three potential options for the location of a hydraulic elevator are proposed. (See Figure 6-95.) The station architect, in coordination with the MBTA, will need to request a variance from MAAB in order to provide only one elevator entrance at this station. The discussion for each option will cover work items affecting both the street and mezzanine levels.

- **Elevator Option A,** shown in Figures 6-97 and 98, located on the edge of the Public Garden, is the most historically sensitive of the 3 siting options. It will provide accessibility to the mezzanine by reopening the existing pedestrian tunnel underneath. This option will require, among other things:




*Existing*

*Proposed*

Figure 6-96: *Option A; elevator image study*

# 6 STATIONS



*Figure 6-98: Elevator Option A, mezzanine level*   Scale: 1"=32'



*Figure 6-97: Elevator Option A, street level*   Scale: 1"=32'

**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN % OF SLOPE
- DIRECTION OF TRAVEL

**ROOM LEGEND:**

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MENS' TOILET
6. WOMENS' TOILET
7. SAFE ROOM
8. SECTION ROOM
9. COMMUNICATIONS ROOM

- modification and reopening of the existing tunnel to incorporate the elevator hoistway and associated machine room. The present flower vendor will need to be relocated.

- elimination of the tunnel's existing intermediate steps (between the unpaid lobby level and the sealed-off stair). The tunnel floor will need to be lowered and leveled with a maximum of 5% slope.

- relocation of the previous Public Garden stair to a new location along the sidewalk edge, next to the proposed elevator headhouse, thus improving its safety and public exposure. The new stair will provide an additional entrance to the station as well as a means of egress from the tunnel underneath.

The architectural imagery for the proposed elevator and stair headhouse should blend with the Public Garden setting. This will require skillful distribution of massing and use of materials. Its design should reflect the existing stone architecture used in the Public Garden.

Figure 6-96 suggests an image for the proposed elevator with a stone base and stone clad corner posts, metal/glass infill, and a copper or translucent roof. A wrought iron guard rail, consistent with the existing Public Garden fence could wrap around the new stair and garden entry.

The entire headhouse structure should be as transparent as possible to provide visual surveillance from both inside and outside the elevator. (See the PDM for cab and elevator guidelines).

The major structural issues for this option will be providing a temporary earth support system for both the demolition of the existing tunnel egress structure and design of the new hoistway, stairway and corridor extension (See Figure 6-99.) Excavation to a depth beyond the existing foundation will require removal or cut off of the original piles, ground water control (see PDM) and waterproofing details to match existing conditions.

The main advantages of Option A are: its location alongside, rather than within the sidewalk, its easy access and visibility from the street, and its potential to be a positive addition to the streetscape through sensitive architecture and landscaping. Also this option has the least impacts on vehicular and pedestrian traffic, tunnel structure and construction.

The main disadvantages of Option A are: its sensitive Public Garden location; complicated review processes; and its remote location through a not visible tunnel to the mezzanine fare array area.



Figure 6-99: Option A: structural diagram

- **Elevator Option B**, shown in Figure 6-100 and 6-101, proposes incorporating the elevator within the Heritage Building, fronting on the sidewalk. This option will require:

  - negotiation of a real estate transaction between the MBTA and the private owner of the Heritage Building; modifications to the storefront facade of the property as well as to the existing retail space and basement in order to accommodate the new elevator structure.

  - an extension of the mezzanine level below.

  - reconstruction of the sidewalk and relocation of utilities to allow access to the Heritage Building basement areas where the lower entrance to the street elevator and machine room will be located.

In this option the elevator entrance should be designed to fit in with the existing facade of the building and, for safety reasons, to be as transparent as possible.

The major structural issues that will be encountered in this option include breaching three floors of the Heritage Building, design of the support system for each level and through the exterior wall, design the support structure for the hoistway at the lower level including closure walls. (See Figure 6-103.)

In addition, within a cut and cover section between the building structure and the station, design a new corridor to the Mezzanine Level and through the exterior wall of the station. Underpinning of the station stairway is required. Option B, compared to the other options, has the least impacts on the streetscape (assuming that the MBTA

# 6 STATIONS



Figure 6-101: Elevator Option B, mezzanine level  Scale: 1"=32'



Figure 6-100: Elevator Option B, street level  Scale: 1"=32'

**Legend**
- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/% OF SLOPE
- DIRECTION OF TRAVEL

**ROOM LEGEND:**
1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MENS' TOILET
6. WOMENS' TOILET
7. SAFE ROOM
8. EJECTOR ROOM
9. COMMUNICATIONS ROOM

MBTA Light Rail Accessibility Program    Schematic Design Report    Rev. #    March 1995

6-48

## 6.3 ARLINGTON

will not require the enclosure of the existing adjacent stairs), and allows for a good connection to the unpaid lobby level below. But it will demand delicate negotiations with a private owner, approval from various reviewing parties, and mitigation of the architectural and construction issues presented above.

- *Elevator Option C*, shown in *Figure 6-105 and 6-106*, calls for the siting of the elevator close to the southeast corner of the Arlington/Boylston intersection, adjacent to the Heritage Building. It will require implementation of the following:

  - elimination of one of the two flights of stairs that combine in a common landing to form one of the present stair entrances to the mezzanine level. This particular stair was selected for elimination because its location allows for the elevator shaft to be situated in the most direct relationship to the nonpaid lobby below. The remaining stair will need to be widened in order to accommodate the appropriate station egress.

  - elimination or modification of the existing retail entrance canopy which will be conflict with the proposed elevator headhouse.

  - reconstruction of the brick sidewalk and relocation of the utilities affected by the construction of the proposed elevator shaft.

  - minor extension of the mezzanine level below to accommodate access to the elevator, machine room and the widened stair connecting to the street.

  - provision of bollards or other safety barriers along the sidewalk curb.

The elevator headhouse should be developed to give a light translucent appearance, with materials and articulations compatible with the Heritage Building. Materials such as steel frame with stone cladding, metal/glass infill, and a copper or translucent roof may be appropriate. (See *Figure 6-104*.)


*Existing*


*Proposed*

*Figure 6-104: Option B; elevator image study*

*Figure 6-102: Option B; elevator image study*



*Figure 6-103: Option B; structural diagram*



Figure 6-105: Elevator Option C, street level   Scale: 1"=32'

Figure 6-106: Elevator Option C, mezzanine level   Scale: 1"=32'

MBTA Light Rail Accessibility Program   Schematic Design Report   Rev. #   March 1995

6 STATIONS

Legend
- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/N OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:
1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MENS' TOILET
6. WOMENS' TOILET
7. SAFE ROOM
8. EJECTOR ROOM
9. COMMUNICATIONS ROOM