UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEIGHBORHOOD ASSOCIATION | ) | |
| OF THE BACK BAY et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 04-11550-JLT |
| v. | ) | |
| | ) | |
| FEDERAL TRANSIT ADMINISTRATION | ) | |
| and MASSACHUSETTS BAY | ) | |
| TRANSPORTATION AUTHORITY, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

September 14, 2005

DEIN, U.S.M.J.

## I.  INTRODUCTION

In this matter, the plaintiffs,[1] collectively "NABB," challenge the site selected by

the Massachusetts Bay Transportation Authority ("MBTA") and finally approved by the

Federal Transit Administration ("FTA") for the construction of a new, handicap-

accessible, entrance to the Arlington Street "T" Station near the Back Bay's historical

Arlington Street Church (the "Church").  In their Complaint[2] the plaintiffs contend that

---

[1]  The plaintiffs are the Neighborhood Association of the Back Bay and several of its members, Dorothy Bromer ("Bromer"), Marianne Castellani ("Castellani"), and Ann D. and Frederick C. Gleason ("A. Gleason" and "F. Gleason").

[2]  All references to the Complaint are to the Second Amended Complaint for Declaratory and Injunctive Relief (Docket No. 8).

the defendants violated Section 106 of the National Historic Preservation Act, 16 U.S.C.

§ 470f (Count I), Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C.

§ 303 (Count II) and the Massachusetts Historic Preservation Act, Mass. Gen. Laws ch. 9,

§ 27C ("MHPA") (Count III, against the MBTA only).  The Complaint seeks declaratory

and injunctive relief.

This matter is presently before the court on cross-motions for summary judgment.

For the reasons detailed herein, this court recommends to the District Judge to whom this

case is assigned that the Plaintiffs' Motion for Summary Judgment (Docket No. 20) be

DENIED, and that the FTA's Motion for Summary Judgment (Docket No. 25) and the

MBTA's Motion for Summary Judgment (Docket No. 27) be ALLOWED.

## II.  **STATEMENT OF FACTS**[3]

### **Overview**

In order to make the Arlington Street MBTA station compliant with the Americans

with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., (the "ADA"), access must be

provided for people in wheelchairs and others unable to use the existing entrances to the

station.  Consequently, a new entrance has to be constructed which will include an

elevator, with an elevator "head house" at ground level, for use by passengers to reach the

underground trains.  The "head house" is a glass structure, approximately 13 feet tall.

The proposed project is to be financed with federal funds from the United States

---

[3]  Citations to "AR" refer to the Administrative Record filed as Docket No. 18.

Department of Transportation ("DOT").  The FTA is the federal agency responsible for approving the federal funding for this project, and has final approval over the proposal submitted by the MBTA.

The site eventually selected by the MBTA for the elevator head house, and approved by the FTA, was the sidewalk on the north side of Boylston Street, approximately 120 feet from the corner and adjacent to the Parish House at the rear of the Arlington Street Church.  The Church is listed on the National and State Registers of Historic Places,[4] and is part of the Back Bay Historic District.  (Complaint ¶¶ 14-15).  The Massachusetts Historical Commission ("MHC") also holds a preservation restriction on the Church under Mass. Gen. Laws ch. 184, §§ 31-33, thereby limiting alterations which can be made without MHC approval.  (AR 265).  In addition the Boston Landmarks Commission ("BLC") has designated the Church as a Boston Landmark.  (Complaint ¶ 16).  The site selection process took over 6 years and involved more than thirty agency and community meetings.  All interested city and state agencies approved the chosen site.  The Church has also approved the chosen site.  NABB, however, claims that the selected location will obstruct the view of the Church.  Thus, the plaintiffs contend that the southwest corner of Boylston Street and Arlington Street would have been the preferred location, and that the defendants' selection was arbitrary and

---

[4]  The Church is not a National Historic Landmark, although it is incorrectly referred to as such in some of the documents.  National Historic Landmarks are given more protections under Section 106 than other properties.  See 36 C.F.R. 800.10.

capricious.

As a federally funded transportation program, the modification of the Arlington Street Station must comply with a number of federal environmental protection and historic preservation laws, including Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f ("Section 106") and Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c) ("Section 4(f)"). See Valley Community Preservation Comm'n v. Mineta, 373 F.3d 1078, 1084 (10th Cir. 2004). Section 106 "provides that before a federal agency may authorize the expenditure of funds for a federal or federally assisted undertaking, it must first consider the effects of such an undertaking on 'any district, site, building, structure, or object that is included or eligible for inclusion in the National Register (of Historic Places).'" Id. at 1085 (quoting Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368, 370 (D.C. Cir. 1999) (quoting 16 U.S.C. § 470f)). "Section 106 is essentially a procedural statute and does not impose a substantive mandate" on the agency. Id. It is the defendants' contention that they complied with all of the procedural requirements of Section 106. The defendants contend further that the FTA's conclusion that there was "no adverse impact" on the Church as a result of the project was amply supported by the record, and was not arbitrary or capricious.

Under Section 4(f), the DOT may approve a project "requiring the use . . . of land of a historical site of national, state or local significance . . . only if (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all

possible planning to minimize harm to the . . . historic site resulting from the use."  49

U.S.C. § 303(c).  In the instant case, the defendants contend that Section 4(f)

requirements are not applicable because the proposed project does not involve the "use"

of any historical site.

### The Approval Process

The Arlington Street MBTA station was designated in 1992 as a "key station"

requiring improvements to make it handicap accessible under the ADA.  (AR 1-7, 27-29).

The MBTA requested until 1998 to make the improvements.  (AR 49-50).[5]  The MBTA

hired Leers Weinzapfel Associates Architects, Inc. ("LWAA") to do design work as well

as to analyze potential sites for accessibility improvements, including the Arlington Street

Station elevator head house.  (AR 124).

At a community meeting held by the MBTA on July 15, 1997, the four corners of

the intersection of Boylston and Arlington Streets were considered as potential sites for

the new head house, and they were all found to be unacceptable.  (AR 126).  As

summarized in an October 17, 2001 report:

> In July 1997, a community meeting was held to look at the four initial
> proposed sites, the four corners at Arlington and Boylston streets.  All of
> these sites were rejected at the meeting.  The northeast corner was not
> acceptable to The Parks Department and the Friends of the Public Garden
> due to the National Historic Landmark status of the Public Garden.  The
> southeast corner adjacent to Heritage on the Garden was not acceptable to

---

[5]  The MBTA subsequently requested and received an extension until 2003 to make the
station handicap accessible due to the problems finding an appropriate location for the elevator.
(AR 163, 172).

the abutter [Ronald Druker] and was not desirable due to low pedestrian traffic from that quadrant.[6]  The southwest corner adjacent to Shreve, Crump & Low was not acceptable to the abutter [Ronald Druker] and was not desirable due to the narrow seven-foot wide sidewalk at that location.[7]  The northwest corner adjacent to the Arlington Street Church was not acceptable to the Boston Landmarks Commission due to its obstruction of the view of the ... church.

(AR 270).  The plaintiffs, while acknowledging that all four locations received opposition at the meeting, reject the conclusion that the southeast corner was inappropriate "due to low pedestrian traffic from that quadrant" or that sidewalk width at the southwest corner near Shreve, Crump & Low was too narrow.  Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Mem.") (Docket No. 21) at 10-11.  Rather, the plaintiffs contend, these problems were merely "excuses to cover the true reason for

_____

[6]  Plaintiffs have sought to enlarge the record to add a document which establishes that the southeast corner of Arlington and Boylston Streets is not within the Back Bay Historic District, although the selected site was within the Historic District.  (Docket No. 48).  This court denied the plaintiffs' motion for leave to file this paper.  Nevertheless, it is undisputed that the southeast corner is not in the Historic District., and that the selected site is within the Historic District.  However, as implicitly acknowledged by the plaintiffs in their current selection of the southwest corner, another site in the Historic District, the defendants are not required by Section 106, Section 4(f), or the MHPA to choose a less viable site simply because it is outside of an historic district.

[7]  It appears that this is now the preferred option of the plaintiffs.  See Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Mem.") (Docket No. 21) at 18.  The Shreve, Crump & Low building on the southwest corner is in the Back Bay Historic District.  While NABB argues that the building is "not shown to have historic character," Id., in fact the record shows that it is potentially eligible for listing on the National Register of Historic Places, similar to the Public Garden (northeast corner) and the Church (northwest corner).  See Massachusetts Bay Transportation Authority's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support if its Cross-Motion for Summary Judgment ("MBTA's Opp.") (Docket No. 28) at 7, n.3; see also AR 134, 138.

gravitating toward the [selected] site, namely the opposition of landowner Ronald Druker and fear of his potential lawsuit." Id. at 11.

Following the meeting, the MBTA instructed LWAA to consider "mid-block" locations west of Arlington Street, the direction from which most of the Station's passengers approach. (AR 126; Affidavit of Winifred Stopps ("Stopps Aff.") (included in Docket No. 27) at ¶ 4).[8] LWAA determined that mid-block locations on either side of Boylston Street would not work due to high costs and lengthy construction times. (Stopps Aff. at ¶ 4; see generally AR 124-161). In addition, LWAA looked at "quarter-block" placements. (Stopps Aff. at ¶ 5). LWAA determined that a quarter-block site on the south side of Boylston would not work due to engineering difficulties and the narrow sidewalk. (Id.). However, LWAA determined that a quarter-block site on the north side of Boylston Street, which is adjacent to the Parish House at the rear of the Church, was a viable site. (Id.; AR 124-132 at option B2). This proposed site, which was eventually selected, is west of Arlington Street, between the corner of Arlington and Boylston Streets and the middle of the block, approximately 120 feet in from the corner. (Stopps Aff. at ¶ 5). Again, the plaintiffs contend that the "problems" with various other sites were merely excuses to avoid the potential lawsuits of Ronald Druker. Plaintiffs' Mem. at 11.

_____

[8] The Stopps Affidavit is not technically part of the Administrative Record. The MBTA relies on the affidavit only in connection with the state law claim. MBTA Opp. at 5, n.2. While the information from the affidavit does not appear to be in dispute, this court has reached its decision on the federal counts without consideration of the affidavit.

LWAA prepared an Additional Site Analysis Report dated November 21, 1997, (AR 124-161), and presented it at a community meeting on April 16, 1998.  (Stopps Aff. at ¶ 7).  Representatives of NABB and the Church were present.  (Id.).  All the alternatives were discussed, but the MBTA indicated that the proposed site was the preferred location, and no objections were voiced at the time.  (Id.).

The FTA became involved in the site selection process after this meeting.  On April 4, 2001, representatives of the FTA met with representatives of the MBTA, LWAA, the MHC and the BLC at the Arlington Street Station, where LWAA discussed its analysis of each potential site.  (AR 388; Stopps Aff. at ¶¶ 8-10).  At this time, the group discussed the viability of using plaintiffs' preferred site, a location in front of Shreve, Crump & Low, at the southwest corner of Arlington and Boylston Streets, instead of the MBTA's proposed location.  (Stopps Aff. at ¶ 9).  The group decided that the location would require a special elevator due to the narrow sidewalk at that corner, and that the elevator would further interfere with already difficult pedestrian traffic.  (Id.).  NABB disagrees with this conclusion.

On October 23, 2001, the FTA convened a "Section 106 consultation" to consider the potential historic impacts of the quarter block, Parish House location that was recommended by the MBTA.  (AR 267-270).  The public was notified about this consultation session, and representatives of the MHC, the BLC and the Church were in attendance.  (AR 275-80).  By letter dated December 9, 2002, the FTA notified the MHC that it had determined that the project will have "no adverse effect on historic resources."

(AR 369).  Moreover, the FTA concluded that "the Section 4(f) requirements do not
apply since the proposed work will not adversely affect the historic qualities of the
Arlington Street Church. . . ."  (Id.).  A draft Environmental Assessment ("EA") dated
November 15, 2002, prepared by the MBTA, was enclosed.  (AR 370-436).  As detailed
therein, given that the project "lies in an area of high historical significance . . . [t]he
siting and detailing of the surface structures has thus been of great concern to the MBTA
and local and state agencies.  The Boston Landmarks Commission, Boston Parks
Department and Massachusetts Historical Commission have therefore been involved in
the project since the beginning in order to ensure that the enclosed proposed design is
appropriate and sensitive to its environment."  (AR 374).  The EA noted further that care
had been taken to minimize the visual impact on views of the Church, and "[t]he historic
views of the Church from across Arlington Street will not be impacted by the new
structure."  (AR 375).  A list of 34 community and agency meetings held from 1996
through 2002 was provided, as was a list of various city and state agencies involved in the
decision-making process.  (AR 385-389).

By letter dated January 21, 2003 to Richard Doyle of the FTA, the MHC
"concur[red] with the FTA's determination that the proposed project will have 'no
adverse effect' on the Back Bay Historic District (36 CFR 800.5(b)) provided that the
MBTA and the Church submit more detailed plans of the accessibility modifications to
the Arlington Street Church for MHC review and approval when they become available
(M.G.L. Chapter 184, Sec. 31-33)."  (AR 460).  These modifications are being done by

-9-

MBTA contractors, though not as part of the Arlington Station federal project.  The Church is paying for these improvements "through a reduction in the amount that will be paid by the MBTA for the acquisition from the Church of property interests that are necessary for the construction of the project."  Brief Amicus Curiae of Arlington Street Church ("Church's Amicus Brief") (Docket No. 46) at 3.  "These improvements will permit the Church to remove the temporary access ramp that defaces the principal (Arlington Street) facade of the Church."  (Id.).

Two comments were received on the draft EA – one from the Boston Groundwater Trust and one from NABB.  (AR 706).  At that time NABB was proposing the northeast corner of the intersection of Arlington and Boylston streets as the appropriate locale. (AR 707).  On May 6, 2004, the MBTA, after considering these comments, asked the FTA to accept the draft EA as the final EA for the project.  (AR 706-708).  Moreover, the MBTA wrote, "given that this project does not have the potential to affect the quality of the human and natural environment, the MBTA is requesting that the Federal Transit Administration issue a Finding of No Significant Impact (FONSI) for the Arlington Station" project.  (AR 708).   The FTA issued the Finding of No Significant Impact on May 14, 2004.  (AR 744-748).  The FTA concluded under Section 106 "that this project will have no adverse effect on historic resources."  (AR 744).  The FTA also determined "that the Section 4(f) requirements do not apply since the proposed work will not adversely affect the historic qualities of the Arlington Street Church within the Back Bay Historic District."  (AR 748).  NABB filed its first complaint for declaratory and

injunctive relief on July 13, 2004.

### The Construction Work Involved

The project will not involve any direct use of the Church building itself.  It does involve the acquisition of a permanent easement of 100 square feet of Church property for a vent, grille, and skylight flush to the ground to allow light into the pedestrian tunnel below.  In addition, the project will require a temporary construction easement of about 4,000 square feet on the Churchyard.  (AR 380, 724).  There will also be restoration of a granite wall at the property line and a new fence in the Churchyard.  (AR 532, 719-720). The church grounds, however, are not part of the Historic Register, and the plaintiffs are only challenging the project insofar as the head house will obstruct the view of the Church.  See Affidavit of Marianne Castellani ("Castellani Aff.") (Docket No. 32) at ¶ 4 ("A steel and glass structure housing an elevator and its machinery partially would obstruct the view of the Arlington Street Church from Boylston Street[.]").

Apart from the project, MBTA contractors will "construct accessibility improvements for the Church at the Church's Parish House" at the Church's expense. Church's Amicus Brief at 3.  The MHC can review these improvements in light of the preservation restriction on the Church.  See Mass. Gen. Laws ch. 184, § 31.

### III.  ANALYSIS[9]

#### A.    Standard of Review

---

[9]  The defendants agreed at oral argument that standing is no longer an issue in light of the affidavits filed by the plaintiffs.  Therefore, that issue will not be addressed.

### 1.    <u>Summary Judgment</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A 'genuine issue' is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."  <u>Calero-Cerezo v. U.S. Dep't. of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004).  "Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue."  <u>Id.</u>

"Neither conclusory allegations nor improbable inferences are sufficient to defeat summary judgment.  Rather, to withstand a properly supported motion for summary judgment, the opposing party must present enough competent evidence to enable a fact finder to decide in its favor on the disputed claims. Evidence that is merely colorable or is not significantly probative cannot deter summary judgment."  <u>Carrol v Xerox Corp.</u>, 294 F.3d 231, 236-7 (1st Cir. 2002) (internal punctuation and citations omitted).

Applying this standard of review to the instant case compels the conclusion that the plaintiffs' Motion for Summary Judgment should be denied and that the defendants' Motions for Summary Judgment should be allowed.

### 2.    <u>Federal Claims: Section 106 and Section 4(f)</u>

Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, "'agency action

must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.'" Valley Community, 373 F.3d at 1084 (citations omitted). "The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. The reviewing court must determine whether the decision was based on a consideration of the relevant factors and whether the agency made a clear error of judgment." Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999) (internal punctuation and citations omitted). "The reviewing court must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record. Only by carefully reviewing the record and satisfying itself that the agency has made a rational decision can the court insure that agency decisions are founded on a reasoned evaluation of the relevant factors." Id. at 203 (internal citation omitted). Thus, a "court's review of whether an agency's decision was arbitrary and capricious must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.'" Concerned Citizens Coalition v. Fed. Highway Admin., 330 F. Supp. 2d 787, 792 (W.D. La. 2004), aff'd, 134 Fed. Appx. 760 (5th Cir. 2005), (quoting Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861, 104 L.Ed.2d 377 (1989)). "A reviewing court may not substitute its own judgment for that of the agency." Id.

### 3.    State Claim - MHPA

The challenge to the discretionary decision of the MHC is in the nature of certiorari under Mass. Gen. Laws ch. 249, § 4.  Where, as here, the plaintiffs contend that the agency abused its discretion in reaching its decision, the court reviews the record to determine whether the decision was arbitrary or capricious.  Northboro Inn, LLC v. Treatment Plant Bd. of Westborough, 58 Mass. App. Ct. 670, 673, 792 N.E.2d 690, 693 (2003).  Accord Chandler v. County Comm'rs of Nantucket County, 437 Mass. 430, 434, 772 NE.2d 578, 581 (2002) ("Certiorari review of such discretionary action is generally not available except to determine whether the action was arbitrary and capricious.").  Thus, the review of all the claims here will involve the same standard.

### B.    Section 106 Claim

### 1.    Statutory Framework

Section 106 of the National Historical Preservation Act requires federal agencies to "take into account the effect" a federal undertaking will have on "any district, site, building, structure or object that is included in or eligible for inclusion in the National Register" and "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking."  16 U.S.C. § 470f. Regulations adopted pursuant to Section 106 "give substance to § 106's consultation requirements" and "include[] specified steps and time limits."  Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 (1st Cir. 2003).  See also 36 C.F.R. pt. 800. "Section 106 of NHPA is a 'stop, look, and listen' provision that requires each federal

agency to consider the effects of its programs. . . .  Under NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c)."  Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 805 (9th Cir. 1999) (internal citation omitted).

If an agency concludes that a project will have "no adverse effect" on an historic property, the agency must notify all consulting parties of the finding and provide them with specified documentation in accordance with 36 C.F.R. § 800.11(e).  The State Historic Preservation Office ("SHPO") which, in Massachusetts, is the MHC, and the consulting parties have 30 days to review the finding.  Id. at § 800.5(c).  If the SHPO agrees with the finding of no adverse effects, then the agency may proceed with the undertaking and its duties under Section 106 are fulfilled.  Id. at §§ 800.4(d)(1), 800.5(c)(1).

It is undisputed that the Arlington Street Church and the Back Bay Historic District are listed in the National Register of Historic Places.  The plaintiffs do not contend that the FTA failed to consult with any required party during the review process. In fact, the record is clear that the FTA consulted, as required, with the MHC, both before and after the finding of "no adverse effect" on the historic property.  See Committee to

Save Cleveland's Huletts v. U.S. Army Corps of Engineers, 163 F. Supp.2d 776, 789

(N.D. Ohio 2001) (describing consultation obligations with the SHPO).  Similarly, the

FTA considered the views of other relevant parties, including interested city and state

agencies as well as the public.  See 36 C.F.R. § 800.4(c), (e) and (f).  Rather, NABB's

complaint is that, despite such consultation, "the FTA has determined that the

construction of a 13 foot tall elevator head house on the Boylston Street sidewalk

partially obstructing the view of the Arlington Street Church has no adverse effect on the

historic nature of the historic church building or on the Back Bay Historic District."

Plaintiffs' Mem. at 14-15.

    The finding of "no adverse effect" means that the undertaking does not meet the

criteria of an "adverse effect" under the Regulations.  36 C.F.R. 800.5(b).  Thus, the

Regulations provide in relevant part:

> An adverse effect is found when an undertaking may alter, directly or
> indirectly, any of the characteristics of a historic property that qualify the
> property for inclusion in the National Register in a manner that would

> diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association . . .

36 C.F.R. § 800.5(a)(1).  "Adverse effects on historic properties include, but are not limited to: . . . (v) Introduction of visible, atmospheric, or audible elements that diminish the integrity of the property's significant historic features . . . ."  Id. at § 800.5(a)(2)(v). Adverse effects also include physical destruction or damage to the property or alterations not consistent with the Secretary's standards for the treatment of historic properties.  Id. at §§ 800.5(a)(2)(i) and (ii).[10]

## 2.    The Finding of "No Adverse Impact"

The FTA's decision that there was "no adverse impact" by the installation of the elevator head house at the selected site will not be overturned unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Aertsen v. Landrieu, 488 F. Supp. 314, 318 (D. Mass.), aff'd 637 F.2d 12 (1st Cir. 1980) (citation omitted).  In the instant case, however, there is ample support for the FTA's decision.

NABB's principal argument is that the finding of "no adverse impact" is "blatantly inconsistent" with the efforts undertaken by the FTA and MBTA "to minimize and mitigate the effects of the surface elevator siting Boylston street."  Plaintiff's Mem. at 15-16.  This argument fails as a matter of law and fact.  Thus, the Regulations themselves

---

[10]  The Regulations also define "effect" as meaning the "alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register."  36 C.F.R. § 800.16(i).

recognize that the existence of potential and/or actual "effects" on historic properties, as well as efforts to minimize such effects, are not inconsistent with a conclusion that an undertaking involves "no adverse effect." See, e.g., 36 C.F.R. § 800.11(e) (documentation of a finding of no adverse effect shall include a description of potential and actual effects on the historic properties as well as "[a]n explanation of why the criteria of adverse effect were found applicable or inapplicable, including any conditions on future actions to avoid, minimize or mitigate adverse effects"). See also Aertsen, 488 F. Supp. at 318 (under Section 106 a federal agency "may determine that the project will have no effect, in which case the project may proceed," or it "may determine that the project will have an effect, but that the effect will not be adverse" in which case the agency must provide specified documentation, or there may be a determination that the project will have an adverse effect, thereby requiring in-depth consultation).

There is no question that the FTA considered the visual impact of the project on the Church. The mere fact that the potential of such an impact was considered does not mean that there was an adverse impact by definition, as the plaintiffs argue. Rather, the record reflects a careful analysis and consideration of all relevant factors, and an attempt to satisfy as many concerns as possible in the location and design of the structure. In short, the record establishes that the FTA complied with "both [its] substantive obligation to weigh effects in deciding whether to authorize the federal action and [its] procedural obligation to consult." Save our Heritage, Inc. v. Federal Aviation Adm'n, 269 F.3d 49, 58 (1st Cir. 2001).

The final location does not interfere with the primary view of the Church in any manner.  The fact that there may be some interference with a view of the property from across the wide-expanse of the heavily-traveled Boylston Street does not defeat the FTA's conclusion that there was no diminution of the integrity of the property's significant historic features, 36 C.F.R. § 800.5(a)(2)(v), or that the head house would not otherwise diminish the integrity of the Church's "location, design, setting, materials, workmanship, feeling or association."  Id. at § 800.5(a)(1).  As the FTA summarized the project's history:

> The record shows that the information before the FTA at the time it was asked to act on the project included a summary of the initial community meeting when everybody objected to putting the elevator kiosk squarely on <u>any</u> of the four's corners, AR 680-83, and the fact that the MBTA's architects went 'back to the drawing board' to analyze alternatives, including potential off-corner sites. *E.g.*, AR270.  It also included the information that the site selected was acceptable to the Church and the Boston Landmarks Commission, AR678, 707, was feasible from the standpoint of engineering concerns and City approvals, AR718-27, and not only preserved the historic front view of the Church, but also would result in the removal of an unsightly 'bunker-like' stairwell entrance currently located at the front of the Church.

FTA's Reply to Plaintiffs' Opposition to FTA's Motion for Summary Judgment and Reply to Defendants' Opposition ("FTA's Reply") (Docket No. 43) at 4.  The Church, the MHC, the BLC, the Parks Department and others all concurred that the site selected was appropriate.  While the plaintiffs may disagree with the conclusion, they have no recourse under Section 106.  "Section 106 is characterized aptly as a requirement that agency decisionmakers 'stop, look, and listen,' but not that they reach particular

outcomes." <u>Narragansett Indian Tribe</u>, 334 F.3d at 166.  <u>Accord</u> <u>Nat'l Mining Ass'n. v.</u>
<u>Fowler</u>, 324 F.3d 752, 755 (D.C. Cir. 2003).

NABB also contends that the problems with the sites other than the selected one
were unsupported by the record.  Having carefully reviewed the record, this court does
not find the factual determinations to be unsupported, much less so clearly unsupportable
so as to render the site selection arbitrary or capricious.  The record indicates that the
abutter's objections were considered along with various other concerns, and rendered
other sites problematic.  There were no inappropriate considerations or factors relied on
by the FTA which would negate the Section 106 process.  Moreover, the site selected had
"no adverse impact" on the Church.  The FTA, therefore, had no obligation to evaluate
other sites, even those which NABB contends would be more appropriate.

After consideration of all relevant comments, "program decisions rest with the
agency implementing the undertaking."  <u>Concerned Citizens Alliance Inc., v. Slater</u>, 176
F.3d 686, 695 (3rd Cir. 1999) (internal quotation omitted).  For all these reasons, this
court recommends that summary judgment enter in favor of the defendants on Count I of
the Complaint.

    C.    <u>**Section 4(f)**</u>

        1.    <u>**Statutory Framework**</u>

Under Section 4(f) of the Department of Transportation Act of 1966, the DOT may
approve a project "requiring the use . . . of land of a historical site of national, State or
local significance . . . only if (1) there is no prudent and feasible alternative to using that

land; and (2) the program or project includes all possible planning to minimize harm to the . . . historic site resulting from the use." 49 U.S.C. § 303(c). This Act employs a more stringent standard than the National Historic Preservation Act, in that it requires the elimination of all other prudent, feasible alternatives as well as a minimization of harm.

Section 4(f) protections only apply to historic sites "when they will be 'used' in the course of the transportation project." 49 U.S.C. § 303(c). Compliance with Section 4(f) requires that the agency (1) determine which resources are protected; and (2) determine whether a proposed project will "use" the identified land. If the land is not used, no further compliance is necessary. If the land is used, the agency may not go forward with the project unless it complies with Section 4(f). See 49 U.S.C. § 303(c); 23 C.F.R. § 771.135(a).

A "use" of protected land can be direct or constructive. A direct use occurs "[w]hen land is permanently incorporated into a transportation facility," while a constructive use occurs when the project does not incorporate the land, but "the project's proximity impacts are so severe that the protected activities, features or attributes that qualify as a resource for protection under section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished." 23 C.F.R. §§ 771.135(p)(1)(i) and (p)(2). Thus, Section 4(f) includes not only actual, physical takings, but significant adverse indirect effects as well. Allison v. Dep't of Transp., 908 F.2d 1024, 1028 (D.C. Cir. 1990). However, "[n]o 'use' will be deemed to have occurred where an action will have

only an insignificant effect . . . ."  Id., citing Sierra Club v. United States Dep't of

Transp., 753 F.2d 120, 130 (D.C. Cir. 1985).  Accord Town of Belmont v. Dole, 766

F.2d 28, 31-32 (1st Cir. 1985); Stewart Park and Reservation Coalition, Inc. (SPARC) v.

Slater, 358 F. Supp.2d 83, 101 (N.D.N.Y. 2005).

### 2.    Finding of "No Use"

Based on the finding of "no use" under Section 4(f), the FTA was not required to

consider feasible and prudent alternatives, and the other requirements of Section 4(f)

were deemed not applicable to the project.  See Geer v. City of Cambridge, 975 F. Supp.

47, 72-74 (D. Mass. 1997).  As detailed herein, the finding of "no use" was not arbitrary

and capricious, and this court recommends that judgment be entered in favor of the

defendants on Count II of the Complaint as well.

### Direct Use

As an initial matter the plaintiffs argue that there was direct use of historic

property and that Section 4(f) applies because of the construction of a permanent

structure in the Back Bay Historic District.  See Supplemental Memorandum in Support

of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Cross-

Motion ("Plaintiffs' Supp. Mem.") (Docket No. 49) at 3.  However, NABB's argument

that any addition in the Historic District is subject to the provisions in Section 4(f) by

virtue of it taking place in an historic district is not supported by the language of the

statute, or common sense.

Section 4(f) prohibits "the use of publicly owned land of a public park, recreation

-22-

area, or wildlife and waterfowl refuge, . . . or land of an historic site of national, State, or

local significance (as determined by the Federal, State, or local officials having

jurisdiction over the park, area, refuge, or site)" unless "(1) there is no prudent and

feasible alternative to using that land; and (2) the program or project includes all possible

planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or

historic site resulting from the use."  49 U.S.C. § 303(c).  The Historic District is not a

park, recreation area or wildlife refuge, and the reference to an historic site clearly refers

to a specific building or other structure of historic significance.

Even the plaintiffs implicitly recognize that Section 4(f)'s prohibition against the

use of an historic site is to a more limited and defined structure than an entire Historic

District.  Thus, while plaintiffs contend that there was an alternative outside the Historic

District, i.e., the southeast corner of the intersection of Arlington Street and Boylston

Street, even they do not recommend that site.  Rather, their preferred location is also

within the Historic District.  Clearly, they understand that their proposed statutory

construction would be unworkable.  As the MBTA argues, "[i]t is simply not reasonable

to read the Section 4(f)'s prohibition on use of a 'site' to forbid locating a bench for bus

passengers, a kiosk with transportation information – or an elevator head house

permitting handicapped people to reach the subway – anywhere in this area."  MBTA

Opp. at 15.

Even if Section 4(f) applied to an Historic District as an "historic site," the FTA's

decision would still not have been arbitrary or capricious.  As an initial matter, the

elevator head house, when viewed in the context of the entire Back Bay, may be considered insignificant.  Moreover, as evidenced by NABB's lack of support for the locale outside the District, there was not a "prudent and feasible alternative" to the use of land within the Historic District.  49 U.S.C. § 303(c).  Finally, the project included "all possible planning to minimize harm to the . . . historic site resulting from the use" as evidenced by the numerous meetings, and consideration of various alternative sites and designs.  Thus, even if Section 4(f) is deemed applicable, it was satisfied.

NABB further appears to argue that because part of the project was within the Church's property, there was a direct use of an historic site.  See Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Opp.") (Docket No. 30) at 7.  However, the record does not support the conclusion that the churchyard is an historic site, and there was no "use" of the Church building.  As detailed above, the project involves a permanent easement of 100 square feet on the Church's property for a vent, grille, and skylight flush to the ground to allow light to shine into the pedestrian tunnel below.  However, the designation of the Church as an historical site was based on its building structures, not the surrounding property.  (See AR 754-59).  There is nothing in this easement which involves use of an historic site.

Finally, NABB contends that the addition of a new ramp and stairs to the Church itself constitutes a direct use of the historic property, warranting Section 4(f) protection.  See Plaintiffs' Opp. at 7.  As an initial matter, this is the first time that the plaintiffs' have

challenged this work, and it far exceeds the parameters of their Complaint. Moreover, as detailed above, this work is not being done with federal funds as part of the FTA project, and therefore does not bring the project within Section 4(f). Thus, NABB's claim of direct use must fail.

## **Constructive Use**

In addition to there being no direct use of an historic site, the FTA's conclusion that there is no constructive use is amply supported by the record. The proposed elevator head does not obstruct the primary view of the Church. Rather, there is a partial obstruction from across Boylston Street, a heavily congested thoroughfare. It was not arbitrary or capricious for the FTA to conclude that there was no substantial impairment of the Church's features or attributes. 23 C.F.R. § 771.135(p)(2) (substantial impairment "occurs only when the protected activities, features, or attributes of the resource are substantially diminished."). See also 23 C.F.R. § 771.135(p)(4)(ii) ("Examples of substantial impairment to visual or esthetic qualities would be the location of a proposed transportation facility in such proximity that it obstructs or eliminates the primary views of an architecturally significant historical building"). Furthermore, where, as here, the SHPO concurs with the conclusion that there is no adverse effect under Section 106, there is no constructive use under Section 4(f) as a matter of law. See 23 C.F.R. § 771.135(p)(5)(i).

In sum, the court is "only obligated to conduct a thorough critique of the Defendants' 4(f) review and guarantee that 'neither the methodology employed nor the

conclusions reached were arbitrary and capricious.'" <u>SPARC</u>, 358 F. Supp.2d at 102

(quoting <u>Citizens for the Scenic Severn River Bridge, Inc. v. Skinner</u>, 802 F. Supp. 1325,

1336-37 (D. Md. 1991)).  A review of the analysis undertaken by the FTA compels the

conclusion that the agency's decisions are amply supported by the record.

### D.  Massachusetts Historic Preservation Act ("MHPA")

The MHPA requires state entities to determine whether a project will have adverse

effects on properties listed in the State Register of Historic Places, and to consult with the

MHC to eliminate, minimize, or mitigate any adverse effects.  Mass. Gen. Laws. ch. 9, §

27C.  Thus, "[a]s early as possible in the planning process of a project undertaken by a

state body . . . the state body . . . shall notify the [Massachusetts Historical] commission

of such project and the commission shall, within thirty days of receipt of such notice,

determine whether such project will have any adverse effect, direct or indirect, on any

property listed on the State Register of Historic Places.  If the commission does not make

a determination within 30 days, the state body . . . may proceed with the project."  <u>Id.</u>

In the instant case, NABB contends that there was a violation of the MHPA

because no final determination was made by the MHC as to whether the project had an

adverse impact on the Church.  However, since the project may proceed if the MHC does

not make a determination within 30 days, and more than 30 days have passed since the

MHC had notice of the project, it is irrelevant whether MHC has affirmatively given its

"final" approval of the proposed project.

Nonetheless, the record is clear that the MHC did fully intend to grant its "final"

approval of the project. Deputy State Historic Preservation Officer and State Archaeologist Brona Simon stated in a letter to the MBTA, "I concur with the FTA's determination that the proposed project will have 'no adverse effect' on the Back Bay Historical District . . . provided that the MBTA and the Church submit more detailed plans of the accessibility modifications to the Arlington Street Church for MHC review when they become available." (AR 460). The MBTA's proposed project does not necessitate any modifications to Arlington Street Church, the Church simply desires improved disabled access to its building and the MBTA has agreed to do the construction along with its own, at the Church's expense. (AR 378-379). Even if the MHC were to ultimately reject the planned modifications to the Church itself, the FTA project would still go forward. Thus, there was no violation of the MHPA, and summary judgment should enter in favor of the MBTA on Count III of the Complaint.

## V. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Plaintiffs' Motion for Summary Judgment (Docket No. 20) be DENIED, and that the FTA's Motion for Summary Judgment (Docket No. 25) and the MBTA's Motion for Summary Judgment (Docket No. 27) be ALLOWED.[11]

---

[11]The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly

/s/ Judith Gail Dein

_____

JUDITH GAIL DEIN
UNITED STATES MAGISTRATE JUDGE

---

indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1ˢᵗ Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1ˢᵗ Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1ˢᵗ Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1ˢᵗ Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1ˢᵗ Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1ˢᵗ Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1ˢᵗ Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1ˢᵗ Cir. 1998).